Uniontown Area School District, Appellant, *v.* Pennsylvania Human Relations Commission.
New Castle Area School District, Appellant, *v.* Pennsylvania Human Relations Commission.
New Kensington-Arnold School District, Appellant, *v.* Pennsylvania Human Relations Commission.

Argued March 12, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Herbert Margolis,* with him *Ray, Buck, Margolis, Mahoney & John,* for Uniontown Area School District, appellant.

*Jonathan Solomon,* with him *Joseph Solomon,* and *Solomon & Solomon,* for New Castle Area School District, appellant.

*Robert J. Key,* with him *Philip Corbin, Jr.,* for New Kensington-Arnold School District, appellant.

*Jay Harris Feldstein,* Assistant Attorney General, with him *Israel Packel,* Attorney General, for appellee.

OPINION BY MR. JUSTICE POMEROY, December 4, 1973:

The appeals now before us are from the decision of the Commonwealth Court in *Philadelphia School District v. Pennsylvania Human Relations Commission,* 6 Pa. Commonwealth Ct. 281, 294 A. 2d 410 (1972) in which that court affirmed orders issued by the Commission to five school districts (Philadelphia, Pittsburgh, Uniontown, New Castle and New Kensington-Arnold) upon a finding by the Commission of a violation by each district of section 5(i)(1) of the Human Relations Act, Oct. 27, 1955, P. L. 744, *as amended,* 43 P.S. §955 (Supp. 1973-74).[1]

## I.

In September of 1967, this Court held that under the section of the Human Relations Act set forth in note 1, the Commission was empowered to correct *de facto* segregation occurring in the public schools of this State. *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 233 A. 2d 290 (1967). Although we noted at the outset that the term "*de facto* segregation" was not fully defined,[2] we found

---

[1] "It shall be an unlawful discriminatory practice . . . (i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of a place of public accommodation, resort or amusement to (1) Refuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, or to any person due to use of a guide dog because of the blindness of the user, either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, resort or amusement." A public school is defined under section 4 of the Act, *as amended,* 43 P.S. §954 (Supp. 1973-74), as a "place of public accommodation."

[2] We quoted, with neither approval nor disapproval, the definition offered by one scholar: "[D]e facto segregation may be defined simply as the racial imbalance in schools which occurs when the number of Negroes in a compact Negro area becomes so great

it unnecessary in *Chester* to state any particular defini-
tion because we there observed that "the . . . figures,
which are not disputed, satisfy *any definition* of de
facto segregation."[3] (Emphasis added.) 427 Pa. at 178.
While we did not think that it followed from the ab-
sence from the Human Relations Act of any particular
definition that the General Assembly had unconstitu-
tionally delegated its law-giving power to the Commis-
sion, we pointed out that the availability of judicial
review under the Administrative Agency Law would
"provide adequate protection . . . [s]hould the com-
mission at some future date abuse its authority," *id.*,
and that in so empowering the Commission to act
against *de facto* segregation, "the Legislature undoubt-
edly envisioned a case-by-case approach." 427 Pa. at
179. Since the date of our decision in *Chester*, the Leg-
islature has not amended the Human Relations Act in
a manner which would suggest disagreement, and we
therefore persevere in our belief that, indeed, the Hu-
man Relations Act does speak to segregation that does
not arise from official policy or acts.[4]

that drawing school zone boundaries on a geographical basis causes
the great majority of Negro children to attend schools which are
overwhelmingly Negro in population." Kaplan, Segregation Litiga-
tion and the Schools—Part I: The New Rochelle Experience; 58
Nw. U.L. Rev. 1, 2 (1963).

[3] The Chester School District at that time operated three all
Negro schools, two schools that were within one percent of all
Negro, and one school that was 87% Negro, notwithstanding that
the Negro students constituted only some 65% of all school students
in the district.

[4] This is not to say that there has been a total absence of
activity in the Legislature with regard to *de facto* segregation.
H.B. 1717, 156th Regular Session (1972), would have deleted from
section 5(i)(1) of the Human Relations Act the words "kinder-
gartens, primary and secondary schools, high schools, academies,
colleges and universities, extension courses and all educational in-
stitutions under the supervision of this Commonwealth", thus leav-
ing the Commission powerless to remedy "unlawful discriminatory

On March 29, 1968, subsequent to *Chester,* the Human Relations Commission together with the Department of Public Instruction adopted through a procedure not elucidated by the records in these appeals a document entitled "Desegregation Guidelines for Public Schools", which described itself as "set[ting] forth guidelines for school districts" and which contained the following paragraph:

"1.  *Segregation as a factor in public education*

"When any one public school building comes to be viewed as improperly exclusive in fact or in spirit; when it is viewed as being reserved for certain community groups; when morale, teacher and pupil motivation and achievement are affected by the racial imbalance, the school system is being adversely affected by segregation. In other words, segregation is not an arbitrary numerical relationship of one group to another. Segregation becomes a factor adversely affecting education when an untoward concentration of any racial group in one building begins to destroy the functioning of the entire system as a 'common school'.

"The common school has long been viewed as a basic social instrument in attaining our traditional goals of equal opportunity and personal fulfillment. The presence in a single school of children from varied backgrounds is an important element in the preparation of young people for active participation in the social and political affairs of our democracy.

"Insofar as possible every school building should reflect in its enrollment a cross section of the entire community." Shortly thereafter, on May 15, 1968, the

---

practice[s]" occurring at such institutions. This bill, in amended form, *passed the House* on June 13, 1972. See 1 Pa. Legis. Journal, No. 144, at 3040-41 (June 13, 1972) (104 yeas; 88 nays; 10 not voting). The Bill was not acted upon by the Senate. It was reintroduced, however, on January 22, 1973 in the 157th Regular Session as H.B. 96 and is now in committee.

Commission and the Department of Public Instruction adopted a document entitled "Recommended Elements of a School Desegregation Plan", one of the tests of which was— "3. How nearly does the desegregation plan bring the percent Negro pupils in each building to within 30% of the percent Negro pupils among the buildings of the same grade span?"[5]

[5] During the Commission hearing in the Uniontown Area School District case, the Commission's Director of the Education Division, Mr. Richard B. Anliot, testified as follows with respect to the manner in which the Commission came to adopt the above documents: "The Commonwealth's definition of what is a segregated or racially balanced school is contained in the two documents to which I referred earlier that were adopted by the State Department of Education and the Pennsylvania Human Relations Commission in March and May of 1968, respectively. The one adopted in March, 1968, was the 'Desegregation Guidelines for Public Schools', in which it speaks of segregation as 'An untoward concentration of any racial group in one building', and in the document adopted in May, 1968, titled, 'Recommended Elements of a School Desegregation Plan', in which a specific evaluation question, 'How nearly does the desegregation plan bring the per cent Negro pupils in each building to within 30 per cent of the per cent Negro pupils among the buildings of the same grade span?' These are the two parts of the Commonwealth's definition of a segregated or racially balanced school.

"[We considered other definitions of segregation] at great length. Before the Commission and Department adopted this definition, the Commission first contracted with New York University Center of Human Relations and Community Studies and Services, Dan W. Dodson, specifically; secondly, it pulled together the definitions of what constitutes racially imbalanced schools that have come forth from other states and from other state courts and departments of education and a great length and very intensively considered those alternate definitions. It, for example, considered the definition in the Massachusetts Racial Imbalance Act of 1965, and the comparable position of the Commissioner of Education of New York State which deemed that a school is racially imbalanced if it has a 50 per cent or more Negro pupils. This was concluded by the Commission and Department to be too narrow, too rigid and without the reality of a proportion of black pupils in a particular public school district or particular grade span.

In its undertaking to apply these principles to the 634 odd school districts in Pennsylvania, the Commission resolved for purposes of administrative manageability to proceed first against those districts (17 in number) in which any one school building contained more than 80% Negro pupils and in which the permissible deviation (30%) was violated. When in the early Spring of 1970 all but two (Philadelphia and Pittsburgh) of these districts had adopted or were in the process of adopting a plan of desegregation acceptable to the Commission, the Commission then approached the eight school districts in which any one school building contained more than 50% Negro pupils and in which the permissible deviation was exceeded.[6] To that end the Commission sponsored in June, 1970 a conference at Allenberry, Pennsylvania to which representatives of the school districts of New Castle, Uniontown and New Kensington-Arnold, among others, were invited and at which the Commission explained its "Desegregation Guidelines for Public Schools" and its "Recommended Elements of a School Desegregation Plan". The three appellant-school districts, however, failed to submit desegregation plans acceptable to the Commission. In late 1970 or early 1971, therefore, the

"It also considered the definition of the Supreme Courts of California and New Jersey which simply said that a racially imbalanced school was one with substantial imbalance, and, once again, this was rejected by the Department and Commission as too imprecise. So that the final definition was felt to be one that could be realistically—that a state of racial balance and desegregation of a school could be realistically achieved and, most importantly, would be based on the reality of each school district separately." *Uniontown* Record at 22a-24a.

[6] The Commission's Director of the Education Division testified that the Commission has yet made no decision whether to proceed against school districts which are imbalanced under the Commission's formula but which have no single school with more than 50% Negro students. *New Kensington-Arnold* Record at 128a.

Commission issued complaints against the three individually and, after a hearing in each case, found *as a fact* that—

"VI. A racially-segregated or racially-imbalanced school is one whose concentration of Negro or white pupils is disproportionate to the enrollment of that particular racial group in all of the schools of the same grade span of a school district.

"VII. A disproportionate racial concentration of pupils in a public school consists of a pupil enrollment in which the percent of Negro pupils is less than or more than thirty (30%) percent of the percent of the Negro pupils in schools of the same grade span of a school district, as defined by the Complainant and Pennsylvania Department of Education in 'Desegregation Guidelines for Public Schools' and 'Recommended Elements of a School Desegregation Plan'."[7] Applying that "fact" to the statistics of the appellant districts (set out in the Appendix to this opinion), the Commission found as a conclusion of law that each district was in violation of Section 5(i)(1) of the Human Relations Act.[8] Consequently, the Commission entered a final

---

[7] Because the practical operation of the Commission's definition may not be self-evident, we set forth a sample calculation:

*Example One:* Assume a school district in which 10% of the elementary school students are Negroes. Each elementary school of this district must have a percentage of Negro students in the range of 7 — 13% (10% x 30% (permissible deviation) = 3%).

*Example Two:* As above, but with a Negro percentage of 50%. A school within the range 35% — 65% Negro is "racially balanced" (50% x 30% (permissible deviation) = 15%).

[8] See note 1 *supra*. The Commission proved a violation of the Human Relations Act in all three hearings involved here as follows: counsel for the Commission called as a witness Mr. Richard B. Anliot, the Commission's Director of the Education Division. Mr. Anliot, in his examination, introduced himself, testified to the existence of the "Desegregation Guidelines for Public

order directing each district to "develop and submit" a plan and timetable for implementation that would eliminate racial imbalance as defined by the Commission.

The appeals of New Castle, Uniontown and New Kensington-Arnold were consolidated for decision with similar appeals taken by Philadelphia and Pittsburgh in the Commonwealth Court,[9] and the Commission's "develop and submit" orders were affirmed. The court held that the school districts' arguments—that a finding of *de facto* segregation was unwarranted and that the standards employed by the Commission (the 30% test, *supra*) were arbitrary and capricious—were "put to rest" in *Chester, supra,* and in our more recent decision in *Balsbaugh v. Rowland,* 447 Pa. 423, 290 A. 2d 85 (1972). The latter case was read by the Commonwealth Court as approving the very definition involved in these appeals, but with a permissible deviation of 10% instead of 30%. The argument against the Commission's definition of racial imbalance, the Commonwealth Court concluded, "is one that must be made to the Human Relations Commission and not to this Court". 6 Pa. Commonwealth Ct. at 286.[10] We granted

Schools" and the "Recommended Elements of a School Desegregation Plan", and finally reviewed the statistics of racial distribution in appellants' schools, statistics which had been furnished by the school districts themselves, pointing out in what particular the statistics varied from the distribution permitted under the Commissions's definition. The Commission then rested. Admittedly, no investigation was conducted into the operation of any district beyond ascertainment of the above statistical data.

[9] The school districts argue here that the Commonwealth Court erred in consolidating the five appeals and point to our language in *Chester, supra,* to the effect that the Commission would proceed on "a case-by-case basis". 427 Pa. at 179. We did not mean by that comment to shape a rule of appellate procedure. As will appear from subsequent discussion, we think this point meritless.

[10] Judge Mencer filed a dissenting opinion in which he distinguished *Chester* and *Balsbaugh* and argued that the Commis-

review at the request of the appellant-school districts and in light of the public importance of the issue presented. We now affirm.[11]

## II.

All agree that the core issue here is the power of the Commission to adopt its definition of racial imbalance, or, put somewhat differently, whether its definition in fact accurately interprets Section 5(i)(1) of the Human Relations Act.

We begin by observing that we have not decided this question previously. In *Chester,* as pointed out earlier, we found it unnecessary to adopt any particular definition of what degree of racial imbalance constituted *de facto* segregation. In *Balsbaugh,* taxpayers in Harrisburg filed a complaint in equity against the Harrisburg City School District, seeking to enjoin the implementation of a desegregation plan drawn up by the school district at the request of the Human Relations Commission.[12] The Commission was not a party to

_____

sion's definition of racial imbalance is unsound and not that required under the Human Relations Act.

[11] The school districts of Pittsburgh and Philadelphia did not join in the petition for allocatur and, hence, are not appellants here.

We additionally note that in its "develop and submit" orders entered against the appellant-school districts, the Commission, applying its definition of racial imbalance, found the districts to have racially segregated faculties as well, and ordered affirmative steps to increase minority representation on appellants' faculties. The Commonwealth Court, however, unanimously refused to approve the orders as applicable to faculties and in its answer to the petition for allowance of appeal, the Commission informed us that it had "voted to comply with the Commonwealth Court's decision rather than appeal it and has amended its original order accordingly".

[12] In *Balsbaugh* we observed that the plan adopted by the Harrisburg City School District was designed to have "the student enrollment in each school . . . reflect *within ten percent (10%)* the

that action and, as we noted, "no challenge of any kind has been made by appellants to the legality or propriety of the directive of the Commission that steps be taken to create a better racial balance, nor was this directive contested by the School Board". 447 Pa. at 433. In stead, we viewed the *Balsbaugh* issue as that of the power of the appellee school board under the Public School Code of 1949 to implement such a plan; we did not there interpret Section 5(i)(1) of the Human Relations Act, nor were we called upon to examine the power here asserted by the Commission to adopt its definition.

The appellant-school districts ask us to say that the Legislature's intention in defining as an "unlawful discriminatory practice" the act of refusing, withholding, or denying "to any person because of his race . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of [a] place of public accommodation. . . ." 43 P.S. 955 (Supp. 1973-74), was not to require that every school building in the Commonwealth reflect to a mathematical precision the racial makeup of the school district as a whole. Were that in fact the approach required, this Court would have great difficulty in saying that such was or was not the Legislature's intention.

As the Commission states in its brief, a search of the Human Relations Act for standards useful in defining *de facto* segregation is unavailing; "none are stated in the Act itself."[13] The Commission's Director of Education, by his testimony, informs us that the

---

racial composition of the total public school population". 447 Pa. at 427 (emphasis added). Whether or not the 10% deviation referred to was produced by application of the Commission's formula we cannot tell, as the matter was decided on a demurrer and the pleadings do not contain information as to the derivation of the racial balance adopted by the Harrisburg City School District.

[13] Appellee's Brief in *New Castle Area School District* at 42.

proffered definition of *de facto* segregation is unique in the United States and that it was adopted after consideration and rejection of other definitions of the term in use elsewhere. It will be useful to review those other definitions.

*Federal law*: Where segregation is *"de facto"*, as distinguished from *"de jure"*, the federal constitutional law as announced by the Supreme Court of the United States forbids only intentionally discriminatory acts. *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 93 S. Ct. 2886, 37 L. Ed. 2d 548 (1973); *Spencer v. Kugler*, 404 U.S. 1027, 30 L. Ed. 2d 723 (1972), *aff'g* 326 F. Supp. 1235 (D.N.J. 1971).[14] It is clear, therefore, that our Human Relations Act reaches segregation not yet remediable under constitutional theories. Congress has forbidden *federal* courts to attempt correction of *de facto* segregation[15] by assignment or transportation of pupils. This statute, of

---

[14] Some earlier lower court decisions were to the contrary. See, *e.g., Cisnerso v. Corpus Christi Independent School District*, 467 F. 2d 142 (5th Cir. 1972), *cert. denied*, 413 U.S. 920, 93 S. Ct. 3053 (1973); *Barksdale v. Springfield School Committee*, 237 F. Supp. 543 (D. Mass. 1965), *vacated*, 348 F. 2d 261 (1st Cir. 1965).

[15] 42 U.S.C. §2000c(b) (1970) defines "desegregation" as— "the assignment of students to public schools and within such schools without regard to their race, color, religion, sex or national origin, but *'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance*." (Emphasis added.)

42 U.S.C. §2000c-6(a)(1970) authorizes the Attorney General to institute legal actions on behalf of persons who claim to be the victims of racial segregation in public schools, but with the following limitation: "[N]othing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards." See also 45 C.F.R. §180.2(b) (1972).

course, has not affected the power of federal courts to remedy *unconstitutional* (*i.e., de jure*) segregation, *Swann v. Charlotte-Mecklenburg Bd. of Education,* 402 U.S. 1, 17-18, 28 L. Ed. 2d 554 (1971), nor does it affect the power of this State to deal with *de facto* segregation as a matter of state law.[16]

Prior to the recent *Keyes* [*Denver School District*] decision requiring that the complainant show affirmative discriminatory action, some federal decisions[17] had dealt with arguments based on the necessity for achieving racial balance. In *Swann v. Charlotte-Mecklenburg Bd. of Education, supra,* for example, the argument was made that the district court had relied on a mathematical formula or "norm" in remedying *de jure* segregation. The Supreme Court answered: "If we were to read the holding of the District Court to require, as a

---

[16] We note, however, that in the Education Amendments Act of 1972, Congress has prohibited the use of federal funds "for the transportation of students or teachers . . . in order to overcome racial imbalance in any school or school system, or . . . in order to carry out a plan of racial desegregation of any school or school system, except on the express written voluntary request of appropriate local school officials". Pub. L. No. 92-318, 92d Cong., tit. VIII, 802(a), 20 U.S.C.A. §1652(a) (Supp. 1973).

It is possible, therefore, that federal funds may be unavailable to defray the cost of whatever transportation of pupils may be incurred in complying with the orders of the Commission. The exact impact on school financing cannot be determined until such time as desegregation plans acceptable to the Commission are adopted. We note, however, that New Kensington-Arnold possesses no school buses at all and lacks cafeteria equipment to provide lunches for children unable to walk home at noon.

For a discussion of the Education Act Amendments, see Comment, *Interpreting the Anti-Busing Provisions of the Education Amendments Act of 1972,* 10 Harv. J. Legis. 256 (1972) ; A. J. Goldberg, *The Administration's Anti-Busing Proposals—Politics Makes Bad Law,* 67 Nw. U.L. Rev. 319 (1972).

[17] See generally Anno., *De Facto Segregation of Races in Public Schools,* 11 A.L.R. 3d 780 (1967).

matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. *The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.*" (Emphasis added.) 402 U.S. at 24. In *Cisneros,* cited *supra* at note 14, the Fifth Circuit, although of the view that the distinction between *de facto* and *de jure* was meaningless when Mexican-American and Negro school children attended neighborhood schools which were overwhelmingly minority-populated, refrained from adopting any mathematical view of to what extent racial mixing would be required. See also *Mapp v. Board of Education of Chattanooga,* 477 F. 2d 851, 857 (6th Cir. 1973) (WEICK, J., dissenting: "There is no provision in the Constitution which can be read as saying that the races must be mixed in each and every school in the system. . . .").[18]

---

[18] See also in this connection the separate opinion of Mr. Justice POWELL in *Keyes v. School District No. 1, Denver, Colorado,* supra, 41 U.S.L.W. at 5009:

"An integrated school system does not mean—and indeed could not mean in view of the residential patterns of most of our major metropolitan areas—that *every school* must in fact be an integrated unit. A school which happens to be all or predominantly white or all or predominantly black is not a 'segregated' school in an unconstitutional sense if the system itself is a genuinely integrated one."

&ast; &ast; &ast;

"[T]he question then becomes what reasonable affirmative desegregative steps district courts may require to place the school system in compliance with the constitutional standard. In short, what specifically is the nature and scope of the remedy?"

&ast; &ast; &ast;

"[I]n school desegregation cases, as elsewhere, equity counsels reason, flexibility and balance. * * * I am aware, of course, that reasonableness in any area is a relative and subjective concept. But

In *Bell v. School City of Gary, Indiana,* 213 F. Supp. 819, 829 (N.D. Ind., *aff'd,* 324 F. 2d 209 (7th Cir. 1963), *cert. denied,* 377 U.S. 924, 12 L. Ed. 2d 216 (1964)), a Dr. Max Wolff[19] testified for plaintiffs and defined a segregated school as " 'any school where the percentage of Negro to white students was one-third greater or one-third less than the percentage of Negro students to white students in the entire system.' " The court in *Bell* replied: "Dr. Wolff cited no authority for his definition of segregated schools other than himself. Dr. Wolff's definition of a segregated school may be a good sociological definition, but the Court can find no

---

with school desegregation, reasonableness would seem to embody a balanced evaluation of the obligation of public school boards to promote desegregation with other, equally important educational interests which a community may legitimately assert. Neglect of either the obligation or the interests destroys the evenhanded spirit with which equitable remedies must be approached."

[19] Dr. Wolff devised a plan for the desegregation of the Chester School District which was favorably received by the Pennsylvania Human Relations Commission. See *Chester, supra,* at 173 n.15 Dr. Wolff and Dr. Dodson, see note 5 supra, upon whom the Commission has relied as an education consultant, are the only sociologists to our knowledge who have urged the adoption of a mathematical formula to achieve maximum racial balance; both adopted the standard themselves as early as 1963.

In *Bell* application of Dr. Wolff's formula to the Gary school system (54% Negro) produced the following definition of an integrated school: a building with a Negro pupil percentage between 36% and 72%. As we will later indicate, more recent sociological studies show that it is the *predominantly* Negro school (or more precisely the predominantly lower economic class school) which is to be avoided if possible. Thus, in a school district that is approximately 50% Negro, permissible deviation would be minimal. It is a peculiar feature of the Commission's formula that at the higher percentages of Negro students (50% for example), the formula permits a deviation of plus or minus 15%, while at the lower percentages (10% as is the case in these appeals), the formula permits only plus or minus 3%. One might argue that the sensitivity to deviation were better reversed.

authority which would indicate that it is a good legal definition." 213 F. Supp. at 829.

While federal courts have so far not found it necessary to adopt any particular definition of *de facto* segregation, one district court, in holding that the constitution reaches imbalance caused by residential patterns, observed as follows: "However, segregation in the sense of racial imbalance, exists in the Springfield school system. While the experts did not agree on what constitutes racial imbalance in general, or in Springfield in particular, it is unnecessary to define the term. In light of the ratio of white to non-white in the total population of the City of Springfield [80% white], *I do find, however, that a non-white attendance of appreciably more than fifty percent in any one school is tantamount to segregation."* (Emphasis added.) *Barksdale v. Springfield School Committee,* 237 F. Supp. 543, 544 (D. Mass., *vacated on other grounds,* 348 F. 2d 261 (1st Cir. 1965)).

One distinguished federal jurist, Judge J. Skelly Wright, in his opinion in *Hobson v. Hansen,* 269 F. Supp. 401 (D.D.C. 1967), *aff'd sub nom. Smuck v. Hobson,* 408 F. 2d 175 (D.C. Cir. 1969), wrote as follows: "In these findings and throughout the opinion . . . 'segregation' will denote the state of racial separateness in the schools, regardless of cause. For expressing the degree of segregation in Washington schools, the court will call a school 'predominantly' Negro (or white) if 85% or more of its students are of that race. This cutoff point is relevant to evidence adduced by the parties respecting the state of segregation beyond which the education or social advantages attached to integration disappear." 269 F. Supp. at 411 n.9.

More recently a sociologist from Harvard University, Dr. Thomas F. Pettigrew, gave his views as to integration in *Bradley v. School Board of Richmond,* 338 F. Supp. 67, 194 (E.D. Va.), *rev'd,* 462 F. 2d 1058 (4th

Cir. 1972), aff'd per curiam by an equally divided court, 412 U.S. 92, 93 S. Ct. 1952, 36 L. Ed. 2d 771 (1973). His testimony is thus summarized by the District Court: "To achieve 'integration', in Dr. Pettigrew's terms, one must have the 'mix plus positive interaction, as we would want to say, between whites and blacks'. Current research indicates that in order to achieve these benefits there is an optimum racial composition which should be sought in each school. Dr. Pettigrew placed this at from 20% to 40% black occupancy. These figures are not all hard and fast barriers, but merely indicate to the racial composition range in which inter-action of a positive sort is the more likely to occur. Social science is not such an exact science that the success or failure of integration depends upon a few percentage points. The lower level of 20% fixes the general area below which the black component takes on the characteristic of a token presence. Where only a few black students are in the particular school, there simply are insufficient numbers for them to be represented in most areas of school activities. Such participation would be crucial to the success of integration. The high level of 40% is linked not to the likely behavior of the students so much as it is to the behavior of their parents. When the black population in a school rises substantially above 40%, it has been Dr. Pettigrew's experience that white students tend to disappear from the school entirely at a rapid rate. . . ."[20]

---

[20] Dr. Pettigrew is not without detractors. See Brunson v. Board of Trustees of School District No. 1 of Clarendon County, South Carolina, 429 F. 2d 820, 824 (4th Cir. 1970) (SOBELOFF, J., concurring, joined by WINTER, J.). He has his supporters as well. See Brief of the Congress of Racial Equality (CORE) in School Board of Richmond v. State Board of Education, U.S. Sup. Ct. No. 72-549, at 10: "[That] an integrated setting can be as potentially damaging psychologically as a segregated setting is amply supported by a growing body of scientific data." The statistical data in the Appendix, infra, reveal that in a class of 20 students, two

*State Law*: According to one author,[21] there are twelve states which by policy discourage racial imbalance in public schools and six states which enforce that policy in some manner—Illinois, Pennsylvania, California, Massachusetts, New Jersey and New York.

The Legislature in Illinois in its Armstrong Act has mandated its school boards to achieve racial balance through periodic review and gerrymandering of neighborhood school attendance zones.[22] The statute by its terms would seem to preclude transportation of students as a tool in achieving balance. In *Tometz v. Board of Education, Waukegan School District No. 61*, 39 Ill. 2d 593, 237 N.E. 2d 498 (1968), the Supreme Court of Illinois upheld the Act against a claim that the state could not constitutionally make race a factor in drawing school boundaries. The court held, however, that while racial balance is a "paramount consideration", it was not the sole relevant consideration in adopting a school boundary. It specifically approved the action of the lower court in considering "traffic, distance, finance [and] classroom capacity". 237 N.E. 2d at 505.

In *Jackson v. Pasadena City School District*, 59 Cal. 2d 876, 31 Cal. Rptr. 606, 382 P. 2d 878 (1963),

---

students will be black after implementation of the formula adopted by the Pennsylvania Human Relations Commission. In a class of 30, three will be black. The appellant-school districts argue with some force that such a minority representation violates that part of the Commission's final order which directs that "[s]aid plan shall avoid extreme isolation of black pupils in a classroom".

[21] Comment, *State Remedies for Racial Imbalance: Increasing Their Educational Impact*, 3 Col. Survey of Human Rights Law 1, 3 (1971).

[22] Ill. Rev. Stat. ch. 122, §10-21.3 (1967): "As soon as practicable, and from time to time thereafter, the [local school] board shall change or revise existing [attendance] units or create new units in a manner which will take into consideration the prevention of segregation and the elimination of separation of school children in public schools because of color, race or nationality."

the Supreme Court of California held that an action in which a Negro child complained of being assigned to a predominantly Negro neighborhood school would withstand a demurrer, concluding that— "a student under some circumstances would be entitled to relief where, by reason of residential segregation, *substantial racial imbalance* exists in his school. . . . The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools, regardless of cause." (Emphasis added.) 382 P. 2d at 881. Exactly what the Supreme Court of California had in mind as "substantial" imbalance has not been subsequently elucidated.

Massachusetts has dealt with the problem of racial imbalance by statute in the Massachusetts Racial Imbalance Act of 1965, St. 1965, c.641. The Act specifically defines the term "racial imbalance" as referring to a "ratio between non-white and other students in public schools which is sharply out of balance with the racial composition of the society in which non-white children study, serve and work. For the purpose of this section, *racial imbalance shall be deemed to exist when the percent of non-white students in any public school is in excess of fifty percent of the total number of students in such school."* (Emphasis added.) In *School Committee of Boston v. Board of Education,* 352 Mass. 693, 227 N.E. 2d 729 (1967), *appeal dismissed for want of a substantial federal question,* 389 U.S. 572, 19 L. Ed. 2d 778 (1968), the Supreme Judicial Court of Massachusetts upheld the Act against constitutional attack similar to that defeated in *Tometz, supra.*[23]

---

[23] The Massachusetts Act is reviewed critically at Note, *Massachusetts Racial Imbalance Act,* 5 Harv. J. Legis. 83 (1967). The author explains the adoption of the 50 percent definition as follows:

"Today, there is much debate over 'tipping points' both in schools and neighborhood housing. The evidence is inadequate and

The Supreme Court of New Jersey has long recognized that the State Board of Education is statutorily empowered to correct racial imbalance in the public schools of that state. Recognizing the difficulty in defining at what point existing imbalance endangers equality of educational opportunity, that court has tentatively adopted the 50% test, relying on *Barksdale, supra,* but at the same time cautions that—"the goal here is a reasonable plan achieving the greatest dispersal consistent with sound educational values and procedures. This brings into play numerous factors to be conscientiously weighed by the school authorities. Considerations of safety, convenience, time, economy and other acknowledged virtues of the neighborhood school policy must be borne in mind." *Booker v. Board of Education,* 45 N.J. 161, 212 A. 2d 1, 11 (1965).

In New York, the Board of Regents promulgates the state policy on racial imbalance. As of 1964, the Board stated that balance "was an important means to a good education, but not . . . an end in itself".[24] In 1963, the State Education Department established a 50% Negro

hence precludes a precise sociological-psychological definition of 'balance'. But a statute must have some definition in order to operate efficiently and effectively. The inconclusiveness of sociological evidence should not deter states from beginning to correct racial imbalance. In the present Act, a figure of fifty percent non-white, although an arbitrary number, is such a beginning. As a suitable starting point, fifty percent has support in New York, the federal courts, and the U. S. Commission on Civil Rights.

\* \* \*

"The focus should be on the point at which the percentage of non-white students in a school deprives them of an equal educational opportunity and not on whether each school has a minimum percentage of non-white students in its population." *Id.* at 93, 95.

[24] Summary of the State Education Department's Position with Respect to the Elimination of De Facto Segregation (Albany, Mar. 6, 1964), quoted in *State Remedies for Racial Imbalance, supra* note 21, at 18.

school population as a cutoff point for initiating inquiry into the possible existence of *de facto* segregation, but indicated that this percentage did not constitute a definition of racial imbalance. An effort by the New York legislature to strip the Board of Regents of its power to deal with *de facto* segregation, N. Y. Educ. Law §3201(2) (McKinney 1970), was held unconstitutional in *Lee v. Nyquist*, 318 F. Supp. 710 (W.D. N.Y. 1970), *aff'd*, 402 U.S. 935, 29 L. Ed. 2d 105 (1971). The Board, however, had earlier abandoned its racial balance policy in large urban areas (New York City) where appreciable change was not possible through transportation, gerrymandering and construction of new schools.

*Other Authorities*: An extensive research study conducted at the behest of the U. S. Department of Health, Education and Welfare makes a strong case for the proposition that the quality of education offered in a school in which students come predominantly from families of lower economic status (which unfortunately is to a large extent synonymous with Negro families) is measureably inferior to that offered in schools where the majority of children were middle class. "[Comparing the test results], in every case but one the highest average score is recorded for the Negro pupils where *more than half of their classmates were white.*" U. S. Dept. of H.E.W., Office of Education, Equality of Educational Opportunity 28 (J. Coleman ed. 1966) (the "Coleman Report") (emphasis added). In the following year, the United States Commission on Civil Rights reexamined the data upon which the Coleman Report was based and issued a report of its own, concluding with the following recommendation, *inter alia,* for legislative action:

"1. *Congress should establish a uniform standard providing for the elimination of racial isolation in the schools.*

"Since large numbers of Negro children suffer harmful effects that are attributable in part to the racial composition of the schools they attend, legislation should provide for the elimination of schools in which such harm generally occurs. No standard of general applicability will fit every case precisely; some schools with a large proportion of Negro students may not in fact produce harmful effects while others with a smaller proportion may be schools in which students are disadvantaged because of their race. But the alternative to establishing such a standard is to require a time-consuming and ineffective effort to determine on a case-by-case basis the schools in which harm occurs. As it has in analagous situations, Congress should deal with this problem by establishing reasonable and practical standards which will correct the injustice without intruding unnecessarily into areas where no corrective action is needed.

"In prescribing such a reasonable standard, there is much to commend the criterion already adopted by the legislature in Massachusetts and the Commissioner of Education in New York, defining as racially imbalanced, schools in which Negro pupils constitute more than 50 percent of the total enrollment. It was found in this report that when Negro students in schools with more than 50 percent Negro enrollment were compared with similarly situated Negro students in schools with a majority white enrollment, there were significant differences in attitude and performance. It is the schools that have a majority-Negro enrollment that tend to be regarded and treated by the community as segregated and inferior schools. Although there are many factors involved, the racial composition of schools that are majority-Negro in enrollment tends to be less stable than that of majority-white schools and to be subject to more rapid change.

"Similar arguments might be advanced for a standard which would deviate slightly from a 50 percent criterion, but a standard set significantly higher would not be adequate to deal with the problem and probably would not result in lasting solution." 1 U. S. Commission on Civil Rights, Racial Isolation in the Public Schools 209-10 (1967). Judge J. Skelly Wright, whose opinion in *Hobsen v. Hansen* we have already quoted, advocated in a law review article that *de facto* segregation is unconstitutional and he set forth the following definition of the degree of imbalance he would urge as unlawful: "[A] school, though mathematically racially imbalanced as compared with other schools in the area, ordinarily would not be racially segregated in the constitutional sense *unless the Negro population of the school outnumbered the white.*" Wright, *Public School Desegregation: Legal Remedies for De Facto Segregation,* 16 Western Reserve L. Rev. 478, 495 (1965). Professor Fiss is of the view that no case has been made for the proposition that maximum racial mixing, the remedy for *de jure* segregation, is a reasonable solution for *de facto* segregation. Fiss, *The Charlotte-Mecklenburg Case—Its Significance for Northern School Desegregation,* 38 U. Chi. L. Rev. 697, 706 (1971). See also Fiss, *Racial Imbalance in the Public Schools: The Constitutional Concepts,* 78 Harv. L. Rev. 564, 571 (1965). Professor Kurland questions the manageability of the concept of "equal educational opportunity", cautioning that the remedy of maximum racial mixing may be an example of sacrificing common sense to a syllogism. Kurland, *Equal Educational Opportunity: The Limits of Constitutional Jurisprudence,* 35 U. Chi. L. Rev. 583, 589 (1968). A general counsel for the National Association for the Advancement of Colored People (N.A.A.C.P.) said the following with respect to defining *de facto* segregation in mathematical terms: "The percentage issue becomes relevant only when cor-

rective measures are considered. Some social scientists are of the opinion that each school in a school system should reflect the ethnic characteristics of the community. This is an optimum solution. The evil that must be remedied, however, is the consignment of Negroes to particular schools. *Percentages may well be used as guidelines in this connection, but rigid application of any arithmetic ethnic formula is not required.*" Carter, *De Facto School Segregation: An Examination of the Legal and Constitutional Questions Presented,* 16 Western Reserve L. Rev. 502, 527 (1965) (emphasis added).

In summary of the foregoing review, it appears that the mathematical definition of *de facto* segregation which the Commission has adopted and which we are asked to say is not a statement of the Legislature's intention in proscribing "unlawful discriminatory practice[s]" under the Human Relations Act[25] is without discoverable support in the legal and sociological materials which we have examined. As far as we have been able to ascertain, the definition of racial imbalance adopted by the Commission reflects only the opinions of Dr. Wolff and of Dr. Dodson, upon whom the Commission has relied for consulting services. In view of the absence of any language in section 5(i)(1) of the Human Relations Act supportive of the Commission's definition and in view of the uniqueness of that definition, we are unable to say that such was the intention of our General Assembly when it enacted the public accommodations section of the Act in 1961, 43 P.S. §954 (Supp. 1973-74).

### III.

Although we are of opinion that the Commission's definition of *de facto* segregation is not statutorily mandated, this is not to say that the Commission was

---

[25] See note 1, *supra.*

without power to adopt it. To the contrary, we are of the view that the Legislature in section 7 of the Human Relations Act, as amended, 43 P.S. §957, did empower the Commission to supply such a definition. In that section it is provided that—

"The Commission shall have the following powers and duties:

. . .

"(d)  To adopt, promulgate, amend and rescind rules and regulations to effectuate the policies and provisions of this act.

"(e)  To formulate policies to effectuate the purposes of this act, and make recommendations to agencies and officers of the Commonwealth or political subdivisions of government or board, department, commission or school district thereof to effectuate such policies.

. . .

"(k)  From time to time but not less than once a year, to report to the Legislature and the Governor describing in detail the investigations, proceedings and hearings it has conducted and their outcome, the decisions it has rendered and the other work performed by it, and make recommendations for such further legislation concerning abuses and discrimination because of race, color, religious creed, ancestry, age or national origin as may be desirable."

There is a well-recognized distinction in the law of administrative agencies between the authority of a rule adopted by an agency pursuant to what is denominated by the textwriters as *legislative* rule-making power and the authority of a rule adopted pursuant to *interpretative* rule-making power. The former type of rule "is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the Legislative body", and "is valid and is as binding upon a court as a statute

if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable". K. C. Davis, 1 Administrative Law Treatise §5.03, at 299 (1958). A court, in reviewing such a regulation, "is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers To show that these have been exceeded in the field of action . . . involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles . . . as to be the expression of a whim rather than an exercise of judgment.'" *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 236-37, 81 L. Ed. 142 (1936). See also *Seattle First National Bank v. United States,* 44 F. Supp. 603, 607 (E.D. Wash. 1942); *In re Da Lomba's Case,* 352 Mass. 598, 603, 227 N.E. 2d 513 (1967) ("rules which have been promulgated pursuant to a legislative grant of power generally have the force of law. . . ."); *Barry Laboratories v. Wisconsin Board of Pharmacy,* 26 Wis. 2d 505, 132 N.W. 2d 833 (1965); *Duke Molner Wholesale Liquor Co. v. Martin,* 180 Cal. App. 2d 873, 4 Cal. Rptr. 904, *cert. denied,* 364 U.S. 870, 5 L. Ed. 2d 92 (1960) ("An administrative rule which is legislative in character is subject to the same test with reference to its validity as is an act of the Legislature. . . ."); Report of the U. S. Attorney General's Commission on Administrative Procedure 99-100 (1941).

An interpretative rule on the other hand depends for its validity not upon a *law*-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with adminis-

tration of the act some deference,[26] the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation. See, *e.g., United States v. Cartwright,* 411 U.S. 546, 93 S. Ct. 1713, 36 L. Ed. 2d 528 (1973); *Skidmore v. Swift & Co.,* 323 U.S. 134, 89 L. Ed. 124 (1944).

Whether or not the Human Relations Commission's definition of *de facto* segregation is backed by *legislative* as distinguished from merely *interpretative* power is in turn a question of "whether or not it is issued pursuant to a grant of law-making power". *Davis, supra,* §5.03, at 302. The statutory provisions quoted above evidence to us a legislative intent to empower the Commission to do a good deal more than merely interpert the Act. The Commission can "adopt, promulgate and rescind rules and regulations to effectuate the policies and provisions of [the] act" and can *"formulate policies* to effectuate the purposes of [the] act". One of the declared purposes of the Human Relations Act is "to assure equal opportunities to all individuals and to safeguard their rights at places of public accommodation. . . ." 43 P.S. §952(b) (Supp. 1973-74). The equal opportunity safeguarded in schools, of course, is

---

[26] Professor Davis summarizes the factors which affect judicial review of *interpretative* regulations as follows: "An interpretative rule may or may not have the force of law, depending upon such factors as (a) whether the court agrees or disagrees with the rule, (b) the extent to which the subject matter is within special administrative competence and beyond general judicial competence, (c) whether the rule is a contemporaneous construction of the statute by those who are assigned the task of construction of the statute, (d) whether the rule is one of long standing, and (e) whether the statute has been reenacted by legislators who know the content of the rule." K. C. Davis, 1 Administrative Law Treatise §5.03, at 300 (1958).

equal educational opportunity and the Commission's view that maximum possible racial mixing within a school district's buildings fosters equal educational opportunity cannot be said to be beyond the Commission's authority, arbitrary or unreasonable.

We note additionally that the Commission's view requiring maximum racial mixing corresponds to the remedy a federal court would order, after *Brown v. Board of Education (1)*, 347 U.S. 483, 98 L. Ed. 873 (1954), following a finding of *de jure* segregation. See *Green v. County School Board*, 391 U.S. 430, 438, 20 L. Ed. 2d 716 (1968) (requiring elimination of segregation "root and branch"). Paraphrasing only slightly what we said in *Balsbaugh v. Rowland*,— "If [maximum racial mixing] may be [the] acceptable, and indeed required, [remedy] in attempting to overcome racial segregation where that condition is historically of *de jure* origin, it would indeed be anomolous if [it] were nevertheless considered to be unreasonable, discriminatory and therefore unconstitutional . . . when voluntarily employed by a state to rectify an imbalance which is the product of *de facto* segregation." 447 Pa. at 438. The Commission's definition of the concept of *de facto* segregation is therefore upheld as within the legislative powers conferred by section 7 of the Act.[27] The wisdom

---

[27] We do not intend by our holding that the Commission has power legislative in nature to resurrect the argument, disposed of in *Chester, supra*, that the Legislature has attempted to delegate its power unconstitutionally. The existence of such power in an administrative agency has not generally been thought to violate that constitutional limitation, at least where the statute provides an ascertainable standard to guide administrative exercise of that power. *Chartiers Valley Joint Schools v. Allegheny County Board of School Directors*, 418 Pa. 520, 211 A. 2d 487 (1965) ; K. C. Davis, 1 Administrative Law Treatise §§2.02, 2.03 (1958).

As we held in *Chester*, we think the standard of the Act (safeguarding equal educational opportunity from harmful effects of racial segregation) coupled with the procedural safeguards of the

or unwisdom of the Commission's definition is no business of ours, the Legislature having by section 7(k), *supra*, placed upon the Commission the duty to make an annual report of its activities and thus having enabled itself to pass upon the policies of the Commission. This the Commission has done.[28]

The orders of the Commonwealth Court are affirmed.[29]

Mr. Justice MANDERINO concurs in the result.

---

Administrative Agency Law and the Commonwealth Documents Law permit approval of the possession by the Commission of power by nature legislative.

[28] Our review of the Annual Reports submitted under this section reveals that the duty of keeping the Legislature informed of its policy with regard to *de facto* school segregation has been well discharged.

In 1968, for example, the year in which the Commission settled on its definition, it informed the Legislature:

"[G]uidelines for desegregating public schools were approved and issued jointly by the Commission and [the Department of Public Instruction], and were sent March 29 to [seventeen school districts with any one school containing more than 80% Negro pupils]. . . .

"The guidelines stated that, *insofar as possible, every school building should reflect in its enrollment a cross section of the entire community.*" (Emphasis added.)

Pa. Human Relations Commission, Thirteenth Annual Report 5 (1968). The Commission's view of what constituted *de facto* segregation was brought to the attention of the Legislature in the two succeeding years as well. See Fourteenth Annual Report at 16 (1969), and the January-June Report of 1970.

[29] Although the appellant-districts have not raised the issue, we observe that there is some question whether it can be said that the second precondition to the validity of a Legislative rule—"issued pursuant to proper procedure", see *Davis, supra,* at 299—is fairly met here. The Commission's definition of a segregated school, notwithstanding its having been labeled a "finding of fact" in the final orders issued by the Commission, is clearly a substantive rule of law; we have so regarded it in this opinion.

Prior to the effective date of the new Commonwealth Documents Law, Act of July 31, 1968, P. L. 769, No. 240, 45 P.S. §1101 *et seq.* (Supp. 1973-74), the rules and regulations of the Commission were

required by section 21 of the Administrative Agency Law, Act of June 4, 1945, *as amended*, 71 P.S. §1710.21, to be placed on file with the Department of State for the examination of interested citizens. The Commission's definition of *de facto* segregation does not appear to have been published as a rule or regulation; certainly it was not among those existing rules and regulations brought over into the Pennsylvania Code under the Commonwealth Documents Law. Under that new Law, an agency preparing to adopt a rule must give public notice of its intention, 45 P.S. §1201, must "review and consider any written comments submitted", 45 P.S. §1202, and "may hold such public hearings as seem appropriate". Although 45 P.S. §1204 does exempt certain types of regulations from this process, *legislative* (as contrasted with *interpretative)* rules are **not** excepted.

In *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 22 L. Ed. 2d 709 (1969), six Justices of the Supreme Court of the United States indicated that the parallel provisions of the federal Administrative Procedure Act were mandatory and that federal agencies could not bypass the legislatively specified procedures for policy formulation (procedures designed to bring a broad spectrum of opinion to bear) in favor of a procedure of developing policy by adjudicatory proceedings.

In exercising a power legislative in nature, we think it necessary to comply fully with legislatively-prescribed procedures. See L. L. Jaffe, Judicial Control of Administrative Action 566 (1965). Whether or not the Commission's definition, formulated in an administrative procedure of unspecified nature, adopted without the broad public notice required under the Documents Law, and unpublished as a rule or regulation so complies are questions which we do not now pass upon and which must await proper presentation.

APPENDIX

| | New Castle Sch. Dist. | New Kensington-Arnold | Uniontown |
|---|---|---|---|
| Percentage of Negro Students in the elementary school "grade span." | 11% | 9.5% | 8.4% |
| Percentage Range Permissible under PaHRC Definition (% Negro Students) in any school. | 7.7-14.3% | 6.5-12.5% | 5.9-10.9% |
| Actual Percentage of Negro Students in each school. | 6 schools – 0%<br>1 " – 0.5%<br>1 " – 3.9%<br>1 " – 23.1%<br>1 " – 47.2%<br>1 " – 58.2%<br><br>11 schools – all "racially imbalanced" | 1 schools – 0%<br>1 " – 0.23%<br>1 " – 0.96%<br>1 " – 1.6%<br>1 " – 4.3%<br>1 " – 9.1% (o.k.)<br>1 " – 10.6% (o.k.)<br>1 " – 13.8%<br>1 " – 21.3%<br>1 " – 55.8%<br><br>10 schools – 8 "racially imbalanced" | 4 schools – 0%<br>1 " – 0.6%<br>1 " – 1.1%<br>1 " – 1.2%<br>1 " – 1.6%<br>1 " – 3.9%<br>1 " – 7.3% (o.k.)<br>1 " – 12.8%<br>1 " – 36.0%<br>1 " – 55.9%<br><br>13 schools – 12 "racially imbalanced" |
| Percentage of Negro Students in the junior high school "grade span." | 8.8% | | |
| Percentage Range Permissible under PaHRC Definition (% Negro Students) in any school | 6.2-11.4% | | |
| Actual Percentage of Negro Students in each school. | 1 schools – 3.6%<br>1 " – 15.7%<br><br>2 schools – both "racially imbalanced" | | |

Note: The junior high school "grade-spans" in the school districts of New Kensington-Arnold and Uniontown are not involved here.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the result reached by the majority solely on the ground that the orders of the Human Relations Commission are within its statutory authority.

The public policy of this Commonwealth is "to safeguard [the] rights [of all individuals] at places of public accommodation . . . ." Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, § 2(b), as amended, 43 P.S. § 952(b) (Supp. 1973). The definition of "place of public accommodation" specifically includes "kindergartens, primary and secondary schools, [and] high schools." Id. at 43 P.S. § 954(1) (Supp. 1973). The Legislature has declared that it is unlawful to "[r]efuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of [a] place of public accommodation. . . ." Id. at 43 P.S. § 955(i)(1) (Supp. 1973). To effectuate the purposes of this Act, the Legislature created the Pennsylvania Human Relations Commission and vested in it the power to "adopt, promulgate, amend and rescind rules and regulations to effectuate the policies and provisions of [the] act," Id. at 43 P.S. § 957(d) (1964), and to "formulate policies to effectuate the purpose of [the] act . . . ." Id. at 43 P.S. § 957(e) (1964).

The wisdom of the actions of the Commission is not subject to this Court's review. Our single jurisprudential task is to determine whether the Commission's actions are within the authority delegated to it by the Legislature. *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 233 A. 2d 290 (1967); cf. *Pennsylvania Human Relations Commission v. Alto-Reste Park Cemetery Association,* 453 Pa. 124, 306 A. 2d 881 (1973). A court reviewing the actions of an administrative agency "is not at liberty to substitute its own discretion for that of administra-

tive officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action . . . involved, it is not enough that the prescribed system . . . shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles . . .' as to be the expression of a whim rather than an exercise of judgment." *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 236-37, 57 S. Ct. 170, 172 (1936).

The majority, applying this test, has, in my view, correctly concluded that "the Commission's view that maximum possible racial mixing within a school district's buildings fosters equal educational opportunity cannot be said to be beyond the Commission's authority, arbitrary or unreasonable." Having so concluded, the inquiry must end.

The Commonwealth Court correctly affirmed the orders of the Human Relations Commission. See *Alto-Reste Park Cemetery Association,* supra; *Chester School District,* supra. Accordingly, I concur in the result.

Mr. Chief Justice JONES and Mr. Justice NIX join in this concurring opinion.