66 A.3d 301

**NORTHWESTERN YOUTH SERVICES, INC.,** Adelphoi Village, Appalachian Youth Services, Inc., Hermitage House Youth Services, Inc., Pyramid Healthcare, Inc. and Tabor Children's Services, Appellees

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE and Office of Children, Youth and Families, Department of Public Welfare, Appellants.**

Supreme Court of Pennsylvania.

Argued Sept. 13, 2011.

Decided April 24, 2013.

Affirmed.

142

144

---

Mark Alan Aronchik, Esq., Alva Catherine Mather, Esq., John Stephen Stapleton, Hangley Aronchik Segal & Pudin, P.C., Daniel M. Fellin, Esq., Doris M. Leisch, Esq., PA Department of Public Welfare, for Appellant.

James G. Collins, Esq., Cozen O'Connor, John A. Kane, Esq., Thomas Kelley, III, Esq., Kelley & Murphy, Joseph Patrick G. Murphy, Esq., for Appellee.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice SAYLOR.*

This is a direct appeal challenging the Commonwealth Court's determination that an administrative bulletin issued by the Department of Public Welfare is comprised of procedurally improper regulations.

## I. Background

Per the Public Welfare Code,[1] county governments bear the responsibility for the delivery of adequate public welfare services to Pennsylvania's children who require them. *See* 62 P.S. § 2305. County children and youth agencies often fulfill this duty through contracts with licensed private organizations. Appellees are non-profit entities furnishing out-of-home child welfare and/or juvenile justice services under such county contracts.

Appellants, the Department of Public Welfare and its Office of Children, Youth and Families (collectively, the "Department" or "DPW"), bear the broader responsibility to assure the provision of adequate child-welfare services throughout the Commonwealth. *See* 62 P.S. § 701. To this end, the Code reposes a substantial component of the responsibility for financial administration in DPW, which—in coordination with the Governor and through recourse to the legislative appropriations process—must substantially reimburse counties for authorized expenditures. *See* 62 P.S. §§ 704.1, 709.1. In turn, the Department pursues blocks of federal aid under Title IV–E of the Social Security Act, 42 U.S.C. §§ 670–679c. As considered below, on account of the federal overlay, substantial constraints are imported into the state scheme impacting Pennsylvania's child-welfare programming.

The present litigation against DPW was commenced by Appellees in the Commonwealth Court in July of 2009. Appellees filed an original jurisdiction petition for review challeng-

---

* This matter was reassigned to this author.

1. Act of June 13, 1967, P.L. 31 (as amended 62 P.S. §§ 101–1503) (the "Code").

ing recent changes to the Department's practices and policies in determining appropriate reimbursement of county expenditures for out-of-home, child-welfare placement services. According to the petition, the reimbursement scheme—as reflected in the Code, in published Department regulations, and in previous administrative practices—embodied a needs-based budgeting process supplemented by compliance review via intermittent auditing of county and service provider records by the state agency. Appellees contended, however, that DPW, through a series of recent administrative bulletins, had unilaterally and inappropriately substituted a restrictive, statewide rate-setting process in place of the prior regime. Appellees also complained that, whereas previous practices emphasized recordkeeping and documentation by the counties, the bulletins imposed newly-minted, strict, and burdensome cost-reporting obligations on providers operating under county contracts. Furthermore, Appellees asserted, although the Department has erected rigorous new thresholds to reimbursement, it had not disclosed the criteria guiding its own assessment of allowable costs.

Appellees lodged substantive and procedural challenges, claiming that the changes effected by the bulletins were *ultra vires* and unconstitutional, or, alternatively, that DPW had failed to comply with mandatory regulatory-review procedures designed to ensure a meaningful opportunity for public participation and independent regulatory oversight.[2] Appellees sought declaratory and injunctive relief.

In defense, the Department acknowledged that it had modified certain of its practices for monitoring county child-welfare expenditures, but it explained that the changes were for good reason and had been implemented in a lawful manner. Beginning in 2003, the Department related, the federal government

2. Specifically, Appellees invoked the Commonwealth Documents Law, 45 P.S. §§ 1102–1602, and 45 Pa.C.S. §§ 501–907, the Regulatory Review Act, 71 P.S. §§ 745.1–745.14, and the Commonwealth Attorneys Act, 71 P.S. §§ 732–101–732–506. These enactments comprise the core of Pennsylvania's scheme for notice-and-comment rulemaking by administrative agencies and legal and regulatory review by the Attorney General and the Independent Regulatory Review Commission.

had conducted an audit of the Commonwealth's program for securing federal, Title IV–E funding. Based on the probe, the federal government took the position that some $220 million in payments for child-welfare services previously made to the Commonwealth were unjustified, either because the children receiving the services were ineligible under Title IV–E criteria, or since Commonwealth records contained insufficient documentation to support federal contributions. Accordingly, DPW noted, the federal government sought clawback repayments.

While the Department clarified that it was contesting the federal government's claims, it stressed the need for improved documentation connected with county child-welfare contracts to avoid jeopardizing future federal-funding increments. DPW also highlighted that the flexible needs-based budgeting process was never a license for counties to make unauthorized or undocumented expenditures. Rather, the Department observed, it has always maintained the authority—and the duty—to undertake child-eligibility and cost-allowability reviews.[3]

In furtherance of the above position (and alongside other contentions), the Department advanced preliminary objections asserting a demurrer. These were overruled, in material part, by the Commonwealth Court via a single judge memorandum. The court referenced existing statutes and codified regulations requiring DPW to reimburse counties for a substantial percentage of their costs,[4] reasoning that these did not allow that

---

3. *See, e.g.,* 62 P.S. § 911(b) (prescribing that DPW "shall have free and full access to . . . all the records, books or papers of or relating to any . . . supervised institution," which term subsumes a broadly-defined conception of "children's institutions," *see id.* § 901); 55 Pa.Code § 3170.106(a) ("The records of the county children and youth agency and its contracted service providers are subject at reasonable times to review and audit by the Department to determine compliance with regulations and policies."); *id.* § 3170.92(b) (requiring local authorities and contractors to maintain records adequate to support expenditure claims).

4. *See, e.g.,* 62 P.S. § 704.1(a) (directing that the Department "shall reimburse county institution districts or their successors for expenditures incurred by them in the performance of their obligation pursuant to this act" according to specified percentage ranges).

payments might be conditioned on providers' conferral of extensive cost data. In this regard, the court acknowledged the Department's statutory authority to visit and inspect children's institutions and examine all matters related to their administration and management, *see id.* § 911(a)(2), but it found that these expressed powers did not subsume the regimented submission of the newly required information on prescribed forms. The court also concluded, with reference to DPW's general licensing authority,[5] that there was no sanction for the mandates contained in the agency's bulletins. Finally, the Commonwealth Court rejected the Department's contention that its published regulation pertaining to reviews and audits of contracted service providers, *see* 55 Pa.Code § 3170.106(a),[6] authorizes a requirement for cost-data reporting.

Appellees, for their part, pursued summary relief under Rule of Appellate Procedure 1532(b), asserting that there were no material factual disputes and their right to relief was clear. The Commonwealth Court agreed and awarded judgment in Appellees' favor. *See Nw. Youth Servs., Inc. v. DPW,* 1 A.3d 988 (Pa.Cmwlth.2010). In doing so, the court focused on the question of whether the prevailing Department bulletin should have been vetted through the formal procedures for promulgation of valid legislative regulations. *See supra* note 2.

Initially, the Commonwealth Court discussed the difference between agency substantive regulations and statements of policy, observing that the distinction turns on whether the agency pronouncement creates a binding norm. *See Nw. Youth Servs.,* 1 A.3d at 993 (citing *PHRC v. Norristown Area Sch. Dist.,* 473 Pa. 334, 350, 374 A.2d 671, 679 (1977) (explaining that valid substantive rules establish standards of conduct

5. *See* 62 P.S. § 1018 ("Every person licensed under this act to maintain, operate and conduct a facility shall keep such records and make such reports as are required by the department.").

6. The regulation provides that the "records of the county children and youth agency and its contracted service providers are subject at reasonable times to review and audit by [DPW] to determine compliance with regulations and policies." 55 Pa.Code § 3170.106(a).

and carry the force of law, whereas policy statements convey future intentions without binding effect)). In making this assessment, the court considered the language of the pronouncements contained in the bulletin, the manner in which the Department had implemented them, and their effect on administrative discretion. *See id.* (referencing factors delineated in *Cash Am. Net of Nev., LLC v. Commonwealth,* 978 A.2d 1028, 1033 (Pa.Cmwlth.2009) (*en banc*), *aff'd,* 607 Pa. 432, 8 A.3d 282 (2010)).

In terms of the bulletin's language, the Commonwealth Court rejected the Department's position that mere guidelines were entailed. Instead, the court indicated, "a review of the Bulletin's plain language establishes that it is replete with mandatory, restrictive language that is indicative of a regulation." *Nw. Youth Servs.,* 1 A.3d at 993. As examples, the court referenced the bulletin's admonitions that: "the maximum levels of state and federal reimbursement approved by the Department are binding on the counties"; "expenditures above the level of Departmental participation and those services funded without Departmental approval shall be the fiscal responsibility of the county"; a provider's "[f]ailure to submit a complete set of contract documentation forms within the appropriate time frame will result in the county receiving a maximum allowable financial participation that is based on the incomplete information"; and compliance with detailed instructions for completion of a cost allocation plan with regard to institutional residential facilities "is mandatory." *See id.* at 993–94 (quoting DPW, Office of Children, Youth and Families Bulletin No. 3170–09–02, at 3–4, 13, 80 (Issued Aug. 25, 2009)) (emphasis omitted). The court analogized such language to requirements which the Department had couched as policy statements in connection with medical assistance programming, but which had been deemed by the Commonwealth Court to be procedurally invalid regulations. *See id.* at 994–95 (citing *Eastwood Nursing & Rehab. Ctr. v. DPW,* 910 A.2d 134 (Pa.Cmwlth.2006)).

As to the second factor—implementation—the Commonwealth Court similarly found that the Department intended

for the bulletin's prescriptions to be treated, not as announcements of some future intention, but as mandatory directives. *See Nw. Youth Servs.*, 1 A.3d at 995. Finally, in terms of agency discretion, the court deemed it evident from the language of the bulletin that there was little or no room for deviation from the prescribed terms. *See id.* at 995.

The Commonwealth Court also disagreed with DPW's assertion that, regardless of whether the bulletin reflects binding norms, its requirements fall comfortably within the parameters of existing regulations.[7] In this regard, the court recognized the Department's express authority to establish maximum levels of reimbursement "by regulation, directive, or memorandum," 55 Pa.Code § 3170.84(a)(1), and to review and audit contractor records, *see id.* § 3170.106(a). Nevertheless, it reiterated that those regulations do not empower DPW to condition reimbursement on providers' submission of detailed cost data and completion of prescribed forms. *See Nw. Youth Servs.*, 1 A.3d at 996.

The Commonwealth Court concluded with the following summary:

> After reviewing the eighty-seven-page Bulletin in its entirety, we are compelled to conclude that the Department intended Bulletin 09–02 to be mandatory and binding on County Agencies and providers of out-of-home placement services. The terms of the Bulletin are neither "guidelines" nor statements of the Department's future intent; rather, they unambiguously mandate that County Agencies and providers must comply with specific cost reporting procedures in order to receive reimbursement. While it is true that individual counties and providers may choose not to participate in Bulletin 09–02's cost review process, the con-

---

7. While the Commonwealth Court did not employ the term, DPW's argument in this regard was and is that its regulations should be viewed as permissible "interpretive rules," which do not need to be channeled through formal rulemaking and review processes. *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 551 Pa. 605, 610, 712 A.2d 741, 743 (1998); *see also infra* Part II.

sequence for failure to do so is that they will receive no reimbursement from the Department.

*Id.*

In its present direct appeal lodged in this Court, the Department maintains that Appellees' effort to attain summary relief should have failed, and the agency's demurrer should have succeeded, because the bulletin merely reflects an essential upgrade of the agency's monitoring policies and practices. DPW does not regard the salient changes—made with an eye toward improved recordkeeping and a more thorough, efficient, and consistent application of pre-existing administrative review and approval powers—as disrupting the connectedness between its practices and its authorizing legislation. From the agency's perspective, the modifications effected by the bulletin are within the range of its existing statutory and regulatory authority to collect and review cost-related data and do not in any way alter providers' rights. In particular, the Department continues to invoke its auditing authority as justification, *see* 55 Pa.Code § 3170.106, contending that its bulletin does "nothing other than implementing these acknowledged powers[.]" Brief for DPW at 36.

Along these lines, DPW refutes any suggestion by Appellees or the Commonwealth Court that the bulletin imposes new penalties, since the agency always has maintained authority to deny reimbursement for unjustified or undocumented expenditures.[8] Furthermore, to the extent the Commonwealth Court was discomfited by the Department's decision to shift the timing of its review to the pre-contractual stage, the agency highlights that pre-existing regulations authorize it to seek

8. *See, e.g.,* 55 Pa.Code § 3170.11(c) ("These policies define the maximum allowable expenditures for Department participation and shall not be construed as mandated rates of expenditure. Expenditures beyond those approved levels are the responsibility of the local authorities."); *see also id.* § 3170.103 ("Expenditures above the level of Departmental participation and those services funded without Department approval shall be the fiscal responsibility of the local authorities. The eligibility requirements included in the regulations refer to maximum level of reimbursement for which the Department will participate ... [T]he expenditures above the approved levels are the responsibility of the county.").

and review evidence of costs "anticipated to be incurred" by both counties and providers. 55 Pa.Code § 3170.92(b). DPW also observes that longstanding regulations make clear that the "records of the county children and youth agency *and its contracted service providers* are subject *at reasonable times* to review and audit by the Department to determine compliance with regulations and policies." 55 Pa.Code § 3170.106(a) (emphasis added). Additionally, in terms of its authority to require the submission of cost data on uniform, electronic forms, DPW quotes the following from its published regulations:

> The local authorities or contractors shall maintain *books, records, documents and other evidence* and accounting procedures and practices, *sufficient to reflect properly all direct and indirect costs* of whatever nature claimed to have been incurred and anticipated to be incurred for funds supported by the Department and for which reimbursement is claimed.

Brief for DPW at 45 (quoting 55 Pa.Code § 3170.92(b)) (emphasis in original).[9]

The Department also vigorously refutes Appellees' claim that its practices embody a rate-setting process.[10] In this respect, DPW distinguishes "reimbursement rates" from "payment rates," highlighting that counties remain free to contract with providers at any rate they may wish (albeit that they are responsible for costs exceeding their authorized reimbursements). According to the Department, the bulletin merely establishes maximum levels of reimbursement consistent with federal and Commonwealth standards of eligibility and allowability.

DPW further stresses that its published regulations authorize it to establish maximum levels of reimbursement "by regulation, directive or memorandum." 55 Pa.Code

9. As discussed below, however, the Department omits from this recitation the regulation's ensuing admonition that "[m]ethods of keeping records is [sic] acceptable as long as it is [sic] complete and accurate." 55 Pa.Code § 3170.92(b).

10. Although the Commonwealth Court's opinions (particularly the opinion awarding summary relief) touched on this consideration, both focused more substantially on the bulletin's cost-reporting facet.

§ 3170.84(a)(1). The Department advances the position that the bulletin, as a directive and/or memorandum, lawfully sets forth its guidelines and procedures for issuing determinations of maximum level of reimbursement, which merely represents the aggregate amount of allowable costs justified to, and approved by, the agency. Accordingly, DPW asks that we overturn both the award of summary relief and the denial of the demurrer, thus terminating this litigation in the agency's favor.

 Alternatively, the Department requests that we at least reverse the award of summary relief, observing that the standard for such a grant is demanding.[11] In this regard, DPW complains that the Commonwealth Court's opinions do not reflect the necessary deference which the judiciary is to afford to agency interpretations of its own governing statutes and regulations. *See, e.g., Slippery Rock Area Sch. Dist. v. UCBR*, 603 Pa. 374, 391–92, 983 A.2d 1231, 1242 (2009) (explaining, in the context of review of a legislative regulation, that courts generally are not free to elevate their own preferences over the discretion of administrative agencies; rather, "[w]hat has been ordered [by the agency] must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment") (quoting, indirectly, *Am. Tel. & Tel. Co. v. U.S.*, 299 U.S. 232, 236–37, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936)); *DPW v. Forbes Health Sys.*, 492 Pa. 77, 81, 422 A.2d 480, 482 (1980) (adopting a similarly deferential standard relative to agencies' interpretations of their own regulations). The Department also contends that disputed issues of fact precluded an award of summary relief. For example, according to DPW, the Commonwealth Court made unsupported determinations as to what are "reasonable times" for records review under the

11. An application for summary relief is to be granted only if there are no material factual disputes and the movant's entitlement to relief is clear. *See Pa. Med. Soc'y v. DPW*, 614 Pa. 574, 587–89, 39 A.3d 267, 276 (2012) (citing *Jubelirer v. Rendell*, 598 Pa. 16, 28, 953 A.2d 514, 521 (2008)). In the determination, the factual averments and the existing record are assessed in the light most favorable to the nonmoving party. *See id.* at 589–91, 39 A.3d at 277.

agency's auditing power, 55 Pa.Code § 3170.106(a), and as to how the bulletin functions, although no facts of record support the court's conclusions.

Appellees, on the other hand, maintain that the bulletin's mandates exceed the Department's statutory and regulatory authority, particularly in the absence of formal notice, public comment, and independent review. *See supra* note 2. According to Appellees, the agency edicts imposed throughout the bulletin's eighty-seven pages are not grounded in the Code or the derivative, codified regulations. Rather, Appellees contend, the bulletin is designed to fundamentally reconfigure the manner in which DPW pays for child-welfare services, vesting open-ended and unrestricted discretion in the agency that is at odds with express constraints placed upon its authority by the General Assembly and reflected in the published regulations.

In terms of the overall redesign, Appellees note the strong parallel between the cost-reporting obligations imposed upon child-welfare providers by the bulletin and those applicable to inpatient hospitals and long-term care facilities in the rate-setting regime of Article IV of the Code, which implement the Medical Assistance Program (or Sections 443.1(1), (2) & (7) of the Public Welfare Code, 62 P.S. §§ 443.1(1), (2) & (7)). Appellees stress, however, that the powers delegated to DPW in the medical-assistance arena are expressly conferred by statute. In contrast, Appellees relate, under Article VII's child-welfare reimbursement system—consistent with the General Assembly's delegation of authority to county governments to operate their child-welfare agencies, *see* 62 P.S. § 2305—the Legislature centered DPW's express authority on the review and approval of county child welfare budgets (while also authorizing records review and auditing for compliance and justification).

It is Appellees' core position that the Department has greatly exceeded this authority by disseminating the bulletin. Indeed, Appellees highlight the General Assembly's circumspection even as to the authorized needs-based budgeting process. *See* Brief for Appellees at 28 ("As is so plainly stated in the statutory provisions regarding the needs based budget-

ing process, the General Assembly has emphatically directed the Department to administer the needs based budgeting process by way of promulgated regulations as opposed to by way of administrative pronouncements that are, as here, developed and finalized through an insular process that is most certainly shielded from independent review and oversight.").

As to the binding norms inquiry, Appellees observe that:

[e]ach of the Bulletins is replete with mandatory language that imposes standards of behavior on providers. The bulletins demand the completion of prescribed forms and submission of detailed and specific cost information to OCYF for review and approval, along with the imposition of maximum allowable contract payment rates and dire financial penalties—absolute unavailability of state matching funds for child welfare services—if the Department determines that a provider (or a county program) has not timely and completely complied with the terms of the Bulletins.

Brief for Appellees at 29–30.

## II. DISCUSSION

### A. Legislative and Non-legislative Rules, Generally

 Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly, which is, as a general rule, by way of recourse to procedures prescribed in the Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act. *See supra* note 2. When an agency acts under the general rule and promulgates published regulations through the formal notice, comment, and review procedures prescribed in those enactments, its resulting pronouncements are accorded the force of law and are thus denominated "legislative rules." *See Borough of Pottstown*, 551 Pa. at 609–10, 712 A.2d at 743. *See generally* Mark Seidenfeld, *Substituting Substantive for Procedural Review of Guidance Documents*, 90 Tex. L.Rev. 331, 335 (2011) ("The canonical mode by which agencies define the meaning of

statutes and regulations or establish policy is legislative rule-making.") (footnote omitted).

 Non-legislative rules—more recently couched (in decisions and in the literature) as "guidance documents"—comprise a second category of agency pronouncements recognized in administrative law practice. These "come in an abundance of formats with a diversity of names, including guidances, manuals, interpretive memoranda, staff instructions, policy statements, circulars, bulletins, advisories, press releases and others." Robert A. Anthony, Commentary, *A Taxonomy of Federal Agency Rules*, 52 ADMIN. L.REV. 1045, 1046 (2000). When such documents fairly may be said to merely explain or offer specific and conforming content to existing statutes or regulations within the agency's purview, they are regarded as "interpretive rules," which generally are exempt from notice-and-comment rulemaking and regulatory-review requirements. *See Borough of Pottstown*, 551 Pa. at 610, 712 A.2d at 743; Seidenfeld, *Substituting Substantive for Procedural Review*, 90 TEX. L.REV. at 346 (explaining that an interpretive rule "is meant to explain preexisting legal obligations and relations that are embodied in the agency's authorizing statutes and regulations") (footnote omitted). Additionally, "statements of policy"—or agency pronouncements which are not intended to bind the public and agency personnel, but rather, merely express an agency's tentative, future intentions—also are not regulations subject to notice-and-comment rulemaking and regulatory-review requirements. *See Borough of Pottstown*, 551 Pa. at 610 n. 8, 712 A.2d at 743 n. 8. [12]

12. The above recitation does not directly track the terms of the Pennsylvania statutory scheme prescribing notice-and-comment rulemaking and regulatory review requirements. *See, e.g.*, 45 P.S. § 1102 (setting forth a definition for "statement of policy" encompassing interpretive rules). Nevertheless, a literal application of the statutes would engender a host of conceptual and practical difficulties, which are beyond the scope of the parties' arguments, the Commonwealth Court's decisions, and this opinion. *See generally* Robert C. Power, *Rulemaking Developments*, 8 WIDENER J. PUB.L. 419, 424–29 (1999); Michael Asimow, *Guidance Documents in the States: Toward A Safe Harbor*, 54 ADMIN. L.REV. 631, 643 n. 61 (2002) (observing that "[t]he Pennsylvania statute, which provides special treatment for both interpretive rules and policy statements, is nearly incoherent."). For present purposes, it is enough

## B. Deference

██ Like the general conceptual overlay, Pennsylvania courts' treatment of deference to administrative agency rules has followed the United States Supreme Court's lead, at least to an interim developmental stage. Under federal and Pennsylvania jurisprudence, properly-enacted legislative rules enjoy a presumption of reasonableness and are accorded a particularly high measure of deference—often denominated *Chevron* deference—by reviewing courts. *See PHRC v. Uniontown Area Sch. Dist.*, 455 Pa. 52, 77, 313 A.2d 156, 169 (1973); *accord Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).[13]

██ Interpretive rules also garner deference deriving from the specialized role and expertise of administrative agencies. *See Uniontown Area Sch. Dist.*, 455 Pa. at 77–78, 313 A.2d at 169. Nevertheless, since interpretive rules may not rest on legislatively-conferred rulemaking powers (and, correspondingly, do not abide notice-and-comment and regulatory review processes), the validity of such a rule may depend "upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets." *Id.* at 77, 313 A.2d at 169. Thus, a lesser quantum of deference may be accorded, and interpretive rules outside the realm of an agen-

to say that, borrowing from federal administrative agency law, Pennsylvania courts have adopted a conceptual overlay which, to a degree, moderates the requirement of formal rulemaking as compared to a literal application of the governing statutory framework.

13. A caveat is that assessment of nature and boundaries of that deference has engendered a large measure of ongoing uncertainty. *See generally* Peter L. Strauss, Essay, *"Deference" Is Too Confusing—Let's Call Them "Chevron Space" and "Skidmore Weight"*, 112 COLUM. L.REV. 1143, 1144 (2012) ("Administrative law scholars have leveled a forest of trees exploring the mysteries of the Chevron approach contemporary judges take to reviewing law-related aspects of administrative action.") (footnote omitted); Daniel J. Gifford, *The Emerging Outlines of a Revised Chevron Doctrine: Congressional Intent, Judicial Judgment, and Administrative Autonomy*, 59 ADMIN. L.REV. 783, 784 (2007) (explaining that, "[w]ithin the last several years, the [United States Supreme] Court began rewriting the so-called Chevron doctrine in ways that are not yet fully understood[.]").

cy's delegated lawmaking authority may be disregarded, when a court is "convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent[.]" *Id.* at 78, 313 A.2d at 169 (citing, *inter alia, Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (explaining that the deference owed to an agency interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.")). For the sake of convenience, courts and commentators frequently refer to this variant of deference as "*Skidmore* deference." *See, e.g., Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326, 128 S.Ct. 999, 1009, 169 L.Ed.2d 892 (2008). *See generally* Strauss, *"Deference" Is Too Confusing*, 112 COLUM. L.REV. at 1153 (explaining that *Skidmore* "is the conventional citation for the proposition that, at least in some circumstances, courts are obliged to take an agency's view about statutory meaning into account when interpreting statutes the agency administers.").[14]

■ Although a lesser quantum of deference is afforded when an agency advances policy via an interpretive rule, this Court—and until very recently the United States Supreme Court—nonetheless has allocated a higher measure of deference (approximating that afforded to legislative rules) to agencies' interpretations of their own regulations. *See, e.g., Forbes Health Sys.*, 492 Pa. at 81, 422 A.2d at 482 (borrowing the "plainly erroneous" or "inconsistent with [a] regulation" standard from *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). *See generally Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C.Cir.1997) (equating deference under *Seminole Rock*

---

**14.** Complicating the analysis, the United States Supreme Court has, at times, applied *Chevron* deference to interpretive rules based upon a series of factors including "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time[.]" *Barnhart v. Walton*, 535 U.S. 212, 222, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

with *Chevron* deference). Consistent with other courts, we will refer to this measure of deference as *"Seminole* deference."

Earlier this year, however, the High Court modified this course of the federal jurisprudence in *Christopher v. Smith-Kline Beecham Corp.,* —— U.S. ——, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012), to apply *Skidmore* deference to an agency interpretation of its own ambiguous regulation. *See id.* at ——, 132 S.Ct. at 2168–69. In this regard, the Court expressed the concern that a higher level of deference "creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'" *Id.* at ——, 132 S.Ct. at 2168 (quoting *Talk Am., Inc. v. Mich. Bell Tel. Co.,* —— U.S. ——, ——, 131 S.Ct. 2254, 2266, 180 L.Ed.2d 96 (2011) (Scalia, J., concurring), and citing Matthew C. Stephenson & Miri Pogoriler, *Seminole Rock's Domain,* 79 GEO. WASH. L.REV. 1449, 1461–62 (2011), and John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules,* 96 COLUM. L.REV. 612, 655–68 (1996)).[15]

It is beyond the scope of this opinion to discuss further the ongoing transformation of the rules and/or standards concerning deference as they continue to evolve in the United States Supreme Court. On this subject, we assume that the Commonwealth Court—as the intermediate court with specialized expertise in the administrative-law field—will remain abreast of the federal-law developments and analyze their merits relative to the Pennsylvania scheme in appropriate circumstances and in due course.[16]

**15.** This concern dovetails with Appellees' position as to the bulletin. Notably, however, the decision in *Christopher* also seems to be informed, substantially, by the circumstance that the agency's interpretation of its regulation was applied retroactively in an enforcement setting. *See Christopher,* —— U.S. at ——, 132 S.Ct. at 2168.

**16.** Such evaluation of the accumulating wisdom seems particularly apt, since the Pennsylvania decisions in the administrative-law field are so closely grounded upon earlier federal cases.

■ Here, however, the dialogue is not centered on the application of deference to a substantive agency interpretation of its own regulations. Rather, the dispositive inquiry is a procedural one controlled by the statutes, such as the Commonwealth Documents Law, imposing formal notice-and-comment and regulatory-review procedures upon the promulgation of legislative rules by administrative agencies (as well as the attendant decisional-law overlay). *See supra* notes 2 & 12. Since DPW is not the agency specially charged with the administration or enforcement of the Commonwealth Documents Law, we differ with its position that it was entitled to a large measure of deference in its interpretation of this law's rulemaking scheme.

We recognize that, in the Department's arguments that its cost-reporting requirements are consistent with the Code and derivative regulations (discussed below), the agency seeks to focus on substantive validity. The present circumstances are very different from those prevailing in decisions cited by the Department, such as *Tire Jockey Serv., Inc. v. DEP*, 591 Pa. 73, 915 A.2d 1165 (2007), or *Popowsky v. PUC*, 589 Pa. 605, 910 A.2d 38 (2006), in which the salient questions were, directly, of such variety. Moreover, and as also discussed below, while we do not discount that the Code, in very general terms, may authorize the agency to promulgate regulations imposing cost-reporting obligations, it seems beyond reasonable dispute that the Department did not follow through, in the context of its existing legislative regulations, to actually impose these. Accordingly, DPW's argument reduces to the assertion that, by promulgating regulations open-ended enough not to preclude cost-reporting duties, *see, e.g.*, 55 Pa.Code § 3170.92, or vague and general enough to sanction any type of obligation or restriction in the abstract, *see* 55 Pa.Code § 3170.84(a)(1), the agency has conferred upon itself the authority to lay down such further mandates less formally, regardless of the substantive impact on the regulated public. We differ with such position both in our decision to withhold *Seminole* deference and in our review of the Department's

remaining contentions, below.[17]

### C. Procedural Validity of Non–Legislative Rules

Challenges to the procedural validity of non-legislative rules have proliferated with the burgeoning use of guidance documents by administrative agencies to advance policy aims. This trend is illustrated by the United States Court of Appeals for the District of Columbia Circuit, a tribunal which resides at the forefront of administrative-law review, in its often-quoted comments, as follows:

> The phenomenon ... is familiar. Congress passes a broadly worded statute. The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like. Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities. Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations.

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C.Cir. 2000).

Such validity challenges frequently rest on assertions, like Appellees', that agencies have inappropriately subverted rulemaking formalities by engaging in excessive policymaking through the use of non-legislative avenues. *Cf.* Jessica Mantel, *Procedural Safeguards for Agency Guidance: A Source of Legitimacy for the Administrative State*, 61 ADMIN. L.REV.

---

**17.** We acknowledge that the degree-of-deference issue is material to Appellees' separate challenge to DPW's authority, under the Public Welfare Code, to apply substantive standards on a pre-contractual basis in determining reimbursement rates (or, in Appellees' terminology, to impose a rate-setting regime). Given its finding of procedural invalidity, however, the Commonwealth Court did not reach this question, and, as reflected below, we also need not reach it here.

343, 345 (2009) ("The impression of the modern administrative state informally adopting important policies through a decisionmaking process lacking adequate procedural protections has troubled many legal scholars and public officials.").[18] In *Appalachian Power*, for instance, utilities and trade associations challenged an Environmental Protection Agency guidance document directing States to assess the sufficiency of periodic monitoring practices in connection with permit programs they administer under the federal clean-air legislation. *See Appalachian Power*, 208 F.3d at 1019–20. Although the document was denominated a policy statement by the agency, the court of appeals found that it "reads like a ukase. It commands, it requires, it orders, it dictates." *Id.* at 1023. Considering the language, purpose, and usage of the document, the court deemed it to be a procedurally improper legislative rule:

> If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'

18. *See generally* Robert A. Anthony, *"Well, You Want the Permit, Don't You? Agency Efforts to Make Nonlegislative Documents Bind the Public,* 44 ADMIN. L.REV. 31, 34 (1992); Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog,* 8 ADMIN. L.J. AM. U. 1, 10 & n. 31 (1994) (citing cases).

At the boundaries at least, distinguishing between rules which are legislative and nonlegislative in character has proven to be a challenging undertaking. David L. Franklin, *Legislative Rules, Nonlegislative Rules, and the Perils of the Short Cut,* 120 YALE L.J. 276, 278–79, 286–87 (2010) (positing that "[t]here is perhaps no more vexing conundrum in the field of administrative law than the problem of defining a workable distinction between legislative and nonlegislative rules," and referencing courts' characterizations of the difference as "fuzzy," "tenuous," "baffling," and "enshrouded in considerable smog") (internal quotation marks and footnotes omitted); Jacob E. Gersen, Essay, *Legislative Rules Revisited,* 74 U. CHI. L.REV. 1705, 1705 (2007) ("The distinction between legislative rules and nonlegislative rules is one of the most confusing in administrative law.").

*Id.* at 1021 (citing Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like— Should Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J. 1311, 1328–29 (1992)). *See generally* John F. Manning, *Nonlegislative Rules*, 72 GEO. WASH. L.REV. 893, 893 (2004) ("If a purported nonlegislative rule has operative characteristics that only a legislative rule can legitimately possess, courts will not hesitate to invalidate that rule on the ground that the agency did not use proper procedures to adopt it.").

In the present case, although occasionally referring to its bulletin in terms applicable to statements of policy, DPW does not convincingly deny that there is an attendant, binding effect. *Cf.* Seidenfeld, *Substituting Substantive for Procedural Review*, 90 TEX. L.REV. at 347 ("Courts have ruled that a policy statement specifying precisely what a regulated entity can do to comply with agency legislative rules is binding" (citing, *inter alia, Appalachian Power*, 208 F.3d at 1023)). Rather, the agency's primary claim is that the impact on child-welfare service providers flows indirectly from the Public Welfare Code and the derivative, published regulations. In other words, DPW relies on the assertedly interpretive dynamic of the bulletin as a means of redirecting the focus of the judicial review of the bulletin's characteristics.

■■■ Like the Commonwealth Court, however, we do not agree that the Code's general conferral of power to make rules and regulations, *see* 62 P.S. § 703, its authorization to license, visit, and inspect, *see id.* §§ 911(b), 1018, or the regulations' provision for general recordkeeping and regulatory monitoring via auditing, *see* 55 Pa.Code §§ 3170.92(b), 3170.106, can be read reasonably to subsume a specialized, affirmative, and extensive cost-reporting requirement. Indeed, the recordkeeping regulation seems rather directly to contradict the Department's position via its assurance that "[m]ethods of keeping records is [sic] acceptable as long as it is [sic] complete and accurate." 55 Pa.Code § 3170.92(b); *see supra* note 9. An interpretive rule "is a declaration of what some other legal command means," Stephenson & Pogoriler, *Seminole Rock's Domain*, 79 GEO. WASH. L.REV. at 1463;

however, the suggestion that the published regulations affirmatively impose a mandatory requirement of cost-reporting to the Department is simply too attenuated.[19] *See generally* Seidenfeld, *Substituting Substantive for Procedural Review,* 90 Tex. L.Rev. at 360–61 ("For interpretive rules, the message from the courts is that the weaker the link between the interpretation and the text of the statute or regulation being interpreted, the less likely a court is to allow the agency to announce the interpretation by guidance document." (footnote omitted)).

To the degree that DPW's arguments suggest that the potential for counties to elect to pay unreimbursed contract rates offsets the binding nature of the cost-reporting required of providers, we also disagree. It is commonly understood that the scale of the tax burden levied at the federal level impacts the ability of state and local governments to raise revenues via taxation, fostering a large measure of dependency on federal funding for maintenance of essential social welfare programs managed from the state and local levels. From this perspective, while DPW repeatedly emphasizes that counties may contract to pay whatever they wish for child-welfare provider services, as a practical matter, it should be clear to all that the availability of federal and state funding very often will be of critical importance in the local decision-making. For these reasons, we conclude, the bulletin is "practically binding," or binding enough. Anthony, *Interpretive Rules,* 41 Duke L.J. at 1374.

Returning to the regulations, we further disagree that the provision directing a maximum level of reimbursement to be established by "directive, or memorandum" can be read as

**19.** Responsive to this point, we expect that DPW might reply that this is the precise juncture at which *Seminole* deference should intervene in its favor. The deference contemplated by the *Seminole* line of decisions (including the Pennsylvania ones), however, is not centered on procedural invalidity and does not serve as an antidote for it. In this regard, we consider the present matter to involve more a matter of determining the appropriate boundaries of legislative and non-legislative rulemaking (which is within the judicial purview) than one of interpreting the Public Welfare Code or the derivative regulations (to which *Skidmore* or *Seminole* deference may attach).

subsuming a cost-reporting regime. 55 Pa.Code § 3170.84(a)(1). In this regard, and again along lines of reasoning employed by the United States Court of Appeals for the District of Columbia Circuit in interpreting the federal enactment governing agency procedure:

> A substantive regulation must have sufficient content and definitiveness as to be a meaningful exercise in agency lawmaking. It is certainly not open to an agency to promulgate mush and then give it concrete form only through subsequent less formal "interpretations." That technique would circumvent . . . the notice and comment procedures [of the governing federal enactment].

*Paralyzed Veterans*, 117 F.3d at 584 (citation and footnote omitted). Notably, as discussed above, the United States Supreme Court also articulated this position very recently in *Christopher*, ―― U.S. at ――, 132 S.Ct. at 2168.[20]

We realize that, as in many other regulatory settings, the General Assembly has delegated an enormous task to DPW, as the agency is charged with filling large gaps in the Public Welfare Code through interstitial policymaking. Plainly, there is a legitimate and essential role for the agency to offer guidance through non-legislative documents. Moreover, we are sensitive to the agency's concerns arising out of the federal audit and ensuing clawbacks. Nevertheless, the Legislature did not wholly relieve the Department of compliance with all of the formalities attending legislative rulemaking in the child-welfare arena, and nothing in the Public Welfare Code or the derivative regulations persuades us that the policy shift manifested in the bulletin can be fairly denominated as a mere interpretation of pre-existing legislative rules.[21]

**20.** *See generally* Stephenson & Pogoriler, *Seminole Rock's Domain*, 79 Geo. Wash. L.Rev. at 1464, 1467 (discussing the potential for an agency to draft legislative rules "broadly and vaguely, and then later resolve all the controversial points by issuing [procedurally unconstrained] interpretive rules," and the remedy that "courts may treat some ostensible interpretive rules as doing too much policymaking work to be viewed as mere interpretations of existing regulations").

**21.** Although DPW has not advanced the argument on such terms, we observe that the cost-reporting requirements of the bulletin at least

█ We hold that the Commonwealth Court did not err in concluding that the bulletin contains procedurally invalid legislative regulations.[22]

The order of the Commonwealth Court is affirmed.

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justice BAER, Justice TODD and Justice McCAFFERY join the opinion.

Justice EAKIN files a dissenting opinion.

arguably might be couched as a matter closely connected to agency practice and procedure, a subject which may be exempted from certain of the requirements of the Commonwealth Documents Law (which was the basis for the Commonwealth Court's decision). *See* 45 P.S. § 1204(1)(iii). In the first instance, however, there is also strength to a counterargument that the imposition of new, affirmative cost-reporting obligations on service providers relates as much or more to obligations on the part of those providers than to agency procedures. Moreover, even if the bulletin would qualify for the exception, the procedure-or-practice exemption does not negate all of the requirements of the Commonwealth Documents Law. *See id.*

Citing *Independent State Store Union v. PLCB*, 495 Pa. 145, 156, 432 A.2d 1375, 1380 (1981), and *Small v. Horn*, 554 Pa. 600, 611, 722 A.2d 664, 670 (1998), the Department also argues that the bulletin represents a type of business decision falling outside the traditional lines separating rules which are legislative versus non-legislative in character. *See, e.g., Indep. State Store Union*, 495 Pa. at 156, 432 A.2d at 1380 (discussing certain "business-type decisions ... [as] a unique form of governmental activity which [is] not amenable to the normal public participation process, and not subject to the Documents Law."). DPW's position is undermined, however, by its own promulgation of cost-reporting requirements in the medical-assistance setting through the formal rulemaking avenue. *See* Brief for Appellees at 22–23, 38 (citing 55 Pa.Code §§ 1187.71, 1187.94–95, 1189.91). We conclude that the bulletin is neither analogous to a new pricing plan for liquor-store merchandise (*Indep. State Store Union*) nor requirements restricting prisoners' ability to wear civilian-type clothing (*Small*).

**22.** In terms of DPW's position that disputed issues of fact precluded an award of summary relief, the agency's argument circles back to the position that the Commonwealth Court misinterpreted its published regulations by finding that they did not subsume cost-reporting mandates. Since we differ with its premise, we are unable to credit this contention as well.

## DISSENTING OPINION

Justice EAKIN.

I respectfully disagree with the majority's holding that the bulletin at issue contains procedurally invalid legislative regulations; I find the guidelines in the bulletin are a permissible exercise of the Department of Public Welfare's (DPW) statutory and regulatory authority to review foster care cost data.

DPW's responsibilities under Title IV–E and Article VII of the Public Welfare Code, 62 P.S. §§ 701–709.4, include oversight of foster care services administered by county children and youth agencies, and allocation of federal and state funds for those agencies. *See id.,* § 704.1(a). DPW is required under § 703 of the Welfare Code to "make and enforce all rules and regulations necessary and appropriate to the proper accomplishment of the child welfare duties and functions vested by law in the county institution districts or their successors." *Id.,* § 703. Thus, the legislature bestowed DPW with both rulemaking and regulatory authority under § 703: "[T]he Code reposes a substantial component of the responsibility for financial administration in DPW, which ... must substantially reimburse counties for *authorized* expenditures." Majority Op., at 145, 66 A.3d at 304 (citing 62 P.S. §§ 704.1, 709.1) (emphasis added).

Bulletin 09–02 is the product of a change in policy occasioned by a massive federal audit, which resulted in the federal government demanding repayment for services it deemed unjustified, due in part to insufficient documentation. *See id.,* at 145–47, 66 A.3d at 304–05. Because the audit underscored the inherent difficulties with its existing practice of reviewing foster care expenses on an *ad hoc* basis, DPW implemented new procedures designed to avoid future conflicts with the federal government, and to assure Pennsylvania receives maximum allowable reimbursement.

Specifically, DPW abandoned the practice of reviewing expenditures after counties negotiated *per diem* rates with private service providers and adopted the proactive approach embodied in Bulletin 09–02. This requires more detailed cost-

reporting procedures to assist monitoring agencies in differentiating between allowable and unallowable expenses. DPW reviews the submitted information to verify compliance with federal and state law, and if discrepancies are found, additional documentation is requested. Once the provider's allowable costs have been determined, those costs are aggregated, and DPW calculates the maximum level of reimbursement it deems appropriate based upon the information in its possession.

I disagree with the Commonwealth Court's application of the "binding norm" test[1] (classifying Bulletin 09–02 as an invalidly promulgated regulation), and also find its reliance on *Eastwood Nursing and Rehabilitation Center v. Department of Public Welfare,* 910 A.2d 134 (Pa.Cmwlth.2006), is misplaced. Furthermore, I must differ with the majority's determination that the cost-reporting regime of the bulletin is not subsumed by current regulations. The three-factor test requires consideration of (1) the plain language of the bulletin, (2) the manner in which DPW has implemented the bulletin, and (3) the amount of administrative discretion allowed by the bulletin. *Northwestern Youth Services, Inc. v. Department of Public Welfare,* 1 A.3d 988, 993 (Pa.Cmwlth.2010) (citing *Cash America Net of Nevada, LLC v. Commonwealth,* 978 A.2d 1028, 1033 (Pa.Cmwlth.2009) (*en banc*), *aff'd,* 607 Pa. 432, 8 A.3d 282 (2010)). Applying these three factors, I find this bulletin merely offers guidance and interpretation of existing regulations.

First, the test requires a plain language consideration of the bulletin for mandatory language. The plain language of the

---

1. In *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671, 679 (1977), this Court adopted the "binding norm" test for determining when a statement of policy is a regulation. The Commonwealth Court has subsequently elaborated on this test. *See R.M. v. Pennsylvania Housing Finance Agency of Commonwealth,* 740 A.2d 302, 306–08 (Pa.Cmwlth.1999) (applying three-factor binding norm test and determining statement of policy, not regulation, was at issue); *Department of Environmental Resources v. Rushton Mining Company,* 139 Pa.Cmwlth. 648, 591 A.2d 1168, 1173 (1991) (explaining "one must look to the extent to which the challenged pronouncement leaves the agency free to exercise discretion to follow or not follow the announced policy in an individual case").

bulletin, however, should not be read in a vacuum. Portions of the bulletin are merely recitations of validly promulgated regulations, which by their nature are mandatory. For example, two of the four sections of the bulletin cited by the majority simply repeat regulations: the phrase "the maximum level of state and federal reimbursement approved by the Department are binding on the counties" is taken directly from 55 Pa.Code § 3170.83,[2] and the phrase "expenditures above the level of Departmental participation and those services funded without Departmental approval shall be the fiscal responsibility of the county" is taken from 55 Pa.Code § 3170.103.[3] *See* DPW, Office of Children, Youth, and Families Bulletin, No. 3170–09–02, at 3–4 (August 25, 2009). Since these are recitations of regulations, these portions do not create new mandatory provisions at all.

The other two uses of mandatory language cited by the majority, "[f]ailure to submit a complete set of contract documentation forms within the appropriate time frame will result in the county receiving a maximum allowable financial participation that is based on the incomplete information," and "compliance with detailed instructions for completion of a cost allocation plan with regard to institutional residential facilities 'is mandatory,'" are mere procedural requirements. Majority Op., at 149, 66 A.3d at 306–07; Bulletin 09–02, at 13, 80. In

2. Section 3170.83(b) states:

 In addition the maximums outlined in § 3170.84 (relating to *maximum levels of reimbursement) shall remain binding on the counties* regarding the amount of costs in which the Department will participate.
 *Id.* (emphasis added).

3. Section 3170.103 states:

 Expenditures above the level of Departmental participation and those services funded without Departmental approval shall be the fiscal responsibility of the local authorities. The eligibility requirements included in the regulations refer to maximum level of reimbursement for which the Department will participate. The county may fund programs, services, and facilities at rates they elect. However, the expenditures above the approved levels are the responsibility of the county. In cases where the county funds at a lower level than that listed in policy, the Department will only participate in expenditures based on the lower level established.
 *Id.* (emphasis added).

fact, upon review of the bulletin, the only mandatory language innate to the bulletin itself is the procedural requirement that information be submitted through specific forms within a specific time frame to be considered for reimbursement. *See* Bulletin 09–02, at 4–5, 9–12. This, however, is only a procedural requirement regarding submission of a form containing information DPW is already permitted to collect and consider in approving reimbursement.[4] Thus, the bulletin's plain language is not "replete with mandatory, restrictive language" indicative of a regulation, *Northwestern Youth Services,* at 993, but merely contains guidelines for agencies and providers concerning existing regulations.

Second, concerning DPW's implementation of the bulletin, note that DPW does not mandate appellees submit the listed forms. Instead, DPW hinges consideration of allowable costs for county services contracted through appellees on data provided through the forms. The county is still at liberty to contract with appellees if they do not submit the forms. *See* Bulletin 09–02, at 4. Notably, the feared consequence, that the county will not be reimbursed for services if appellees do not prove allowable costs, does not stem from the requirements of the bulletin; rather, it is a result of valid regulations.[5] Thus,

4. Counties establish rates of payment with providers and are instructed to use the policies in §§ 3170.41–3170.49 (relating to personnel expenses); §§ 3170.51–3170.61 (relating to operating expenses); and §§ 3170.71–3170.77 (relating to fixed assets) to develop these rates. 55 Pa.Code § 3170.83(b). Counties and providers are required to keep records "sufficient and appropriate . . . to justify payment for expenses by the Department." *Id.,* § 3170.92(b). The records of counties and providers are subject to review and audit by the Department. *Id.,* § 3170.106(a). Finally, allowable costs are not defined or changed by the bulletin; determination of whether a cost is allowable is proscribed by 55 Pa.Code Chapters 3130, 3140 and 3170; Office of Children, Youth, and Families Bulletin, No. 3140–08–01, at 2–9 (March 4, 2008); The Social Security Act, Title IV, Part E, 42 U.S.C. § 601 *et seq.;* and The Child Welfare Policy Manual.

5. *See supra,* note 4 (discussing definition of allowable costs). Bulletin 09–02 does discuss a determination of the maximum level of reimbursement, as described in 55 Pa.Code § 3170.84(a); however, the maximum level of reimbursement is dependent upon allowable costs by regulation. 55 Pa.Code § 3170.11(b) (stating "[t]he extent of Departmental participation is dependent upon the level of funding for which a given service qualifies *and the allowability of expenditures* as they are defined

this nexus between the bulletin and its regulations shows that implementation of Bulletin 09–02 is only an interpretation of existing, valid regulations.

Third, Bulletin 09–02 does not restrict agency discretion. DPW retains its discretion in determining allowable costs and the maximum level of reimbursement on a case-by-case basis when reviewing the submitted data. Accordingly, I find mandating standardized forms does not outweigh the discretion retained by DPW in determining allowable costs and the maximum level of reimbursement on a case-by-case basis. Thus, the three-factor test supports classifying Bulletin 09–02 as a tool providing guidance and interpretation of valid regulations, not as a procedurally invalid regulation.

I disagree with the analogies drawn by the Commonwealth Court between Bulletin 09–02 and the invalidly promulgated regulation in *Eastwood Nursing*. The Commonwealth Court found *Eastwood Nursing* instructive in categorizing Bulletin 09–02 as an invalid regulation because both policy statements were "restrictive, directive, [and] substantive," and thus more like regulations. *Northwestern Youth Services*, at 994 (citing *Eastwood Nursing*, at 148). However, in *Eastwood Nursing*, the policy statement in question initiated an application process involving a new substantive qualification—that nursing homes had to establish a need for additional beds for approval of an application, when this need for beds was not defined or present in any of the applicable statutory or regulatory provisions. *Eastwood Nursing*, at 147–48 & n. 19. While the Commonwealth Court was correct that both policy statements required a new procedure, it overlooked the distinction that Bulletin 09–02 did not create any new substantive requirements, unlike the policy statement in *Eastwood Nursing*.

As to the procedural requirement of cost reporting, the Commonwealth Court's decision in *Central Dauphin School*

in this chapter") (emphasis added). Thus, the bulletin does not mandate the maximum level of reimbursement—the regulations do. The bulletin mandates only the format of proof necessary to show allowable costs and thus determine the maximum level of reimbursement, which is done on a case-by-case basis.

*District v. Department of Education,* 147 Pa.Cmwlth. 426, 608 A.2d 576 (1992), is persuasive. In *Central Dauphin,* the Commonwealth Court held a requirement that school districts answer a list of questions and submit them at a certain time for purposes of legislatively mandated budget reopening was not an invalidly promulgated regulation. *Id.* at 582–83. The court noted, "The budget reopening instructions request that school districts present their budget information to the Secretary in a fashion that will facilitate the Secretary's understanding of the information and ability to report accurately to the Senate and House Education Committees whether a school district has complied with Act 25's strictures." *Id.* at 582. The court determined the manner in which the districts were required to adjust their budgets was determined by the relevant Act, and not by the guidance document, which merely provided the districts with a means for determining whether their budgets comported with the Act. *Id.* Similarly, the manner in which counties and providers here are reimbursed is dictated by the Welfare Code, and not Bulletin 09–02, which merely provides a gauge for determining compliance with the Code.

Further, in *Central Dauphin,* the court rejected the school districts' argument that enumerated penalties for failure to submit the information requested in the budget reopening instructions constituted a binding norm. *See id.* at 582–83. Just as the penalties in *Central Dauphin* derived from the Public School Code, the penalty for failure to submit the requested information here derives from the Welfare Code.[6] The penalty for noncompliance is "merely a restatement of existing mechanisms for enforcing the [Welfare Code] and is not the genesis of a binding norm." *Central Dauphin,* at 583. Accordingly, I find Bulletin 09–02 is not a regulation because, while it has prescribed a format and time for submission of

6. DPW is expressly forbidden from making payments for child welfare services rendered during "any period in which the county institution district or its successor fails to substantially comply with the regulations of the department promulgated pursuant to section 703." 62 P.S. § 704.1(c). Submitting reimbursement requests for unallowable expenses would constitute a failure to substantially comply with the regulations.

information, evaluation of that information relies on valid statutory and regulatory authority and proceeds on a case-by-case basis.

Furthermore, I disagree with the view that Bulletin 09–02 cannot be interpretative because the applicable statute and code sections do not include a cost-reporting requirement. *See* Majority Op., at 162, 66 A.3d at 315. DPW is expressly permitted under existing regulations to review a provider's *per diem* rates in advance and declare a maximum reimbursement rate. Thus, the reliance on only the final sentence of the record-keeping regulation, which states, "[m]ethods of keeping records is [sic] acceptable as long as it is [sic] complete and accurate," *id.* (quoting 55 Pa.Code § 3170.92(b)), is misleading. The relevant regulation, in its entirety, reads:

> (b) *Records maintenance.* County agencies *shall maintain sufficient and appropriate records and data to justify payment for expenses by the Department.* The local authorities or contractors shall maintain books, records, documents and other evidence and accounting procedures and practices, *sufficient to reflect properly all direct and indirect costs* of whatever nature claimed to have been incurred and anticipated to be incurred for funds supported by the Department and for which reimbursement is claimed. Records shall be kept for a minimum of 5 years after the close of the fiscal year. Time and attendance and payroll distribution records shall be maintained for each employee. Methods of keeping records is [sic] acceptable as long as it is [sic] complete and accurate.

> (c) *Financial reporting requirements.* The *Department has the authority to prescribe the format, instruction, and time* at which the county agency shall submit to the Department annual plans, annual estimates of expenditures and revisions, as well as expenditure and income reports.... The Department reserves the right to withhold future payments for non-submission of financial reports.

55 Pa.Code § 3170.92(b)-(c) (emphasis added). Subsection (b) requires the documentation be "sufficient to reflect properly all direct and indirect costs." *Id.*, § 3170.92(b). Clearly,

based on the federal audit, there were significant deficiencies in the documentation procedures, and the county agencies failed to "maintain sufficient and appropriate records and data to justify payment for expenses by the Department." *See id.* In light of the counties' failure to comply with such regulations, DPW was justified in upgrading its monitoring policies and practices. Specifically, subsection (c) provides, "The Department has the authority to prescribe the format, instruction, and time at which the county agency shall submit to the Department annual plans[.]" *Id.,* § 3170.92(c).

Therefore, the suggestion these published regulations affirmatively impose a mandatory requirement of cost-reporting to DPW is not too attenuated. *But see* Majority Op., at 162–65, 65 A.3d at 315–16. I find it difficult to accept the proposition that DPW must implement such a program without the ability to ensure it would be properly carried out. Moreover, the provision directing a maximum level of reimbursement to be established by "directive[ ] or memorandum" can indeed be read as including a cost-reporting regime. *See id.* at 316 (citing 55 Pa.Code § 3170.84(a)(1)). Therefore, I reject the notion that DPW exceeded its authority by implementing measures to calculate maximum reimbursement rates through the directives published in Bulletin 09–02.

Faced with Office of Inspector General reports indicating the Commonwealth's Title IV–E program had internal control weaknesses, DPW sought to rectify the problem by implementing new procedures to increase efficiency and prevent future conflicts with federal officials. In doing so, DPW acted within its statutory and regulatory authority in issuing this interpretative guidance document. Based on the foregoing, I would reverse the decision of the Commonwealth Court. I therefore dissent.