**[J-32-2023] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

THOMAS WASHINGTON,                        :  No. 13 MAP 2022
                                          :
              Appellant                   :  Appeal from the Order of the
                                          :  Commonwealth Court at No. 485
                                          :  MD 2020 dated December 30, 2021
         v.                               :
                                          :  ARGUED:  May 24, 2023
                                          :
THE PA DEPARTMENT OF                      :
CORRECTIONS,                              :
                                          :
                                          :
              Appellee                    :

**CONCURRING OPINION**

**JUSTICE DOUGHERTY**                          **DECIDED:  December 19, 2023**

I join much of the majority opinion,[1] and I fully join its disposition, but respectfully, I take a slightly different position on the extent to which legislative notice is provided by the amendment to Act 84.  As the majority aptly explains, the prior version of Act 84 did not specify a rate at which inmate funds were to be deducted to collect restitution and other court-ordered obligations or costs.[2]  Consistent with Act 84, the Department of

_____

[1] I join the majority opinion except for Section III.B.1.b and the last paragraph of footnote 53.

[2] Prior to amendment, the statute provided:

> The county correctional facility to which the offender has been sentenced or the Department of Corrections shall be authorized to make monetary deductions from inmate personal accounts for the purpose of collecting restitution or any other court-ordered obligation or costs imposed under section 9721(c.1).  Any amount deducted shall be transmitted by the Department of Corrections or the county correctional facility to the probation department of the county or other agent designated by the county

(continued…)

Corrections ("DOC") developed policy statement DC-ADM-005, which provided DOC would deduct 20% of deposits into inmates' accounts as long as they had a minimum balance of $10.

Importantly, most of the relevant Act 84 precedent was decided while the old statute and policy were in place.[3]  First, in *Buck v. Beard*, 879 A.2d 157 (Pa. 2005), while we acknowledged prisoners have a property interest in their inmate accounts and are entitled to due process for deprivations of that money, we held that due process did not require an additional **judicial** hearing to determine the inmate's ability to pay before making Act 84 deductions.  *See Buck*, 879 A.2d at 160-61.  Notably, we explained it was "significant that Section 9728(b)(5) became effective two years prior to imposition of [a]ppellant's sentence[, and t]herefore, at the time of his sentencing he was on notice of the Department's statutory authority to deduct funds from his account."  *Id.* at 160.

Almost ten years later, the U.S. Court of Appeals for the Third Circuit addressed procedural due process challenges to Act 84 deductions in *Montañez v. DOC*, 773 F.3d 472 (3d Cir. 2014).  The court preliminarily explained state prisoners have a property interest in the funds in their inmate accounts, and the requisite procedural due process is to be measured according to the test laid out in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Under that test, a court is to weigh:

> (1) "the private interest that will be affected by the official action[,"] (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards[,"]

---

commissioners of the county with the approval of the president judge of the county in which the offender was convicted.  The Department of Corrections shall develop guidelines relating to its responsibilities under this paragraph.

42 Pa.C.S. §9728(b)(5) (2010), *amended by* 42 Pa.C.S. §9728(b)(5)(i) (2019).

[3] I briefly touch on these cases to highlight certain points important to my analysis.  For a fuller discussion of these cases, I defer to the majority's thorough recitation.  *See* Majority Opinion at 33-47.

and (3) the governmental interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Montañez,* 773 F.3d at 483, *quoting Mathews*, 424 U.S. at 335.

After finding the benefits of providing process outweighed any government interests or burdens of administering process for purposes of the *Mathews* analysis, the Third Circuit held some pre-deprivation process was required. *See id.* at 484-85. The court then agreed with this Court's *Buck* decision that "Pennsylvania need not provide an additional judicial hearing for every inmate to determine ability to pay before making deductions[.]" *Id.* at 485. It held, however, "the existence of a **general** statutory provision and implementing regulations **providing the DOC with authority** to collect funds from inmates' accounts does not satisfy the Commonwealth's obligation to provide prior notice and an opportunity to be heard to inmates regarding deductions from inmate accounts." *Id.* at 486 (emphasis added). Rather, "[a]t a minimum, federal due process requires inmates to be informed of the terms of the DOC Policy and the amount of their total monetary liability to the Commonwealth." *Id.* Specifically, the court held, "DOC must disclose to each inmate before the first deduction: the total amount the DOC understands the inmate to owe pursuant to the inmate's sentence; **the rate at which funds will be deducted** from the inmate's account; and which funds are subject to deduction." *Id.* (emphasis added). It reiterated the process could be relatively informal and did not require a separate "judicial-like hearing," but instead, noted "DOC could provide inmates with an informal opportunity to supply written objections to prison administrators prior to the first deduction." *Id.*

A few years later, this Court addressed a similar procedural due process challenge to Act 84 deductions in *Bundy v. Wetzel*, 184 A.3d 551 (Pa. 2018). In *Bundy*, we explained due process is a flexible concept under the *Mathews* balancing test. *See* 184 A.3d at 557. We identified a "general preference that procedural safeguards apply in the

pre-deprivation timeframe[,]" and that the "controlling inquiry" is "whether the state is in a position to provide for pre-deprivation process." *Id.*, *quoting Hudson v. Palmer,* 468 U.S. 517, 534 (1984). We then adopted the Third Circuit's holding that "to comply with due process, [DOC] must, prior to the first deduction: (a) inform the inmate of the total amount of his financial liability as reflected in his sentencing order, as well as **[DOC's] policy concerning the rate at which funds will be deducted** from his account and which funds are subject to deduction; and (b) give the inmate a reasonable opportunity to object to the application of [DOC's] policy to his account." *Id.* at 558-59 (emphasis added). We reasoned the requirements outlined in *Montañez* would "help protect against errors in [DOC's] application of its Act 84 deduction policy without significantly impeding its ability to carry out essential functions." *Id.* at 559. Thus, we held such process was due under *Mathews*. *See id.*

In 2019, the year after *Bundy* was decided, the Act 84 deduction statute was amended. It now provides:

(5) Deductions shall be as follows:

(i) The Department of Corrections shall make monetary deductions of **at least 25% of deposits** made to inmate wages and personal accounts for the purpose of collecting restitution, costs imposed under section 9721(c.1), filing fees to be collected under section 6602(c) (relating to prisoner filing fees) and any other court-ordered obligation.

. . .

(iv) The Department of Corrections and each county correctional facility shall develop guidelines relating to its responsibilities under this paragraph. The guidelines shall be incorporated into any contract entered into with a correctional facility.

42 Pa.C.S. §9728(b)(5) (2019) (emphasis added). Significantly, unlike the prior version of Act 84 in effect when *Bundy* and *Montañez* were decided, Act 84 now provides a minimum deduction rate rather than providing DOC absolute discretion to set the rate.

The following year, the Court reaffirmed the due process requirements set out in *Bundy* and *Montañez* in *Johnson v. Wetzel*, 238 A.3d 1172 (Pa. 2020). In *Johnson*, we held an inmate subject to his first Act 84 deduction before *Bundy* and *Montañez* were decided was entitled to post-deprivation process conforming to the requirements outlined in those cases. *See* 238 A.3d at 1182 ("when pre-deprivation process is not feasible — meaning that the state is not in a position to provide it — 'the availability of a meaningful post-deprivation remedy satisfies due process'"), *quoting Bundy*, 184 A.3d at 557. But notably, our *Johnson* decision did not mention the amendment to Act 84 or its 25% minimum deduction rate.

In the present case, the majority rejects the argument Washington received notice of the rate of deduction because the statute itself provided "[l]egislative [n]otice" by setting the 25% minimum deduction rate, as citizens are presumed to know the laws of the Commonwealth. Majority Opinion at 48-50. The majority disposes of this argument on a few grounds with which I agree.[4] I respectfully disagree, however, with the majority's reasoning the legislative notice rationale "is at odds with our Act 84 precedents[, and i]f inmates are deemed to be fully on notice of the DOC's Act 84 deduction policies at the time Act 84 became effective, the notice requirements for such deductions as set forth in *Montañez*, *Bundy*, and *Johnson* would be rendered moot." *Id.* at 49.

Relying on *Bundy*, the majority explains that although *Buck* held that because Act 84 "went into effect before sentencing occurred, the defendant had adequate notice of [DOC's] authority under Act 84 to deduct funds from his account[,]" "*Buck* did not deal

---

[4] *See* Majority Opinion at 48-49 (explaining (1) Washington did not challenge the constitutionality of the amended Act 84 on due process grounds; (2) his challenge is to DOC's failure to provide notice and an opportunity to be heard in response to DOC's new Act 84 policy, which is a distinct governmental act from the statutory amendment; and (3) DOC's policy demonstrates they are in fact distinct governmental acts because DOC acts with discretion in implementing Act 84).

with whether any sort of administrative pre-deprivation process is constitutionally required before the first deduction is made." *Id.* at 49, *quoting Bundy*, 184 A.3d at 558 n.5. Similarly here, the majority reasons, Washington does not challenge the legislature's power to enact the Act 84 amendment or DOC's authority to implement the legislative scheme, and thus, our concern "is not whether Washington was notified of the contents of the statute, but whether he was adequately notified of critical elements of the Current DOC Policy implementing the amendment and whether he was afforded the opportunity to challenge it before his property was garnished at the higher rate." *Id.* at 49-50; *see also id.* at 51 n.45 ("*Bundy* addressed the prior version of Act 84, which had no prescribed deduction rate of any sort. Thus, the essence of *Bundy*'s notice requirement was communication **of the DOC's policy implementing Act 84**, not the terms of the act itself. It was the DOC's policy, therefore, and not the enabling statute, that is the impetus for the procedural due process rights at issue.") (emphasis in original).

I agree with the majority that **in this case**, the current version of 42 Pa.C.S. §9728(b)(5) does not provide requisite notice of the rate of deduction as required by *Montañez*, *Bundy*, and *Johnson*. But in my view, those cases do not categorically reject a legislative notice rationale.[5] Under a different legislative scheme — particularly, if the

---

[5] It is well established we presume people have knowledge and are on notice of the law. Nearly two-hundred years ago, this Court explained:

> It is an unquestionable principle, which applies to civil as well as criminal cases, that ignorance of law will not furnish an excuse for any person, either for a breach or omission of duty. *Ignorantia legis neminem excusat* is a maxim which is as much respected in equity as in law. This doctrine is among the settled elements of the law; for every man, at his peril, is bound to take notice of what the law is, as well the law made by statute as the common law[.] The presumption is, that every man is acquainted with his own rights, provided he has a reasonable opportunity to know them.

*Rankin v. Mortimere*, 7 Watts 372, 374 (Pa. 1838) (citation omitted); *see also* 31A Corpus Juris Secundum Evidence §221 (2021) ("All persons are presumed to know the general (continued…)

statute set a mandatory deduction rate without any allowance for DOC to exercise discretion — the statute itself could provide notice of the rate of deduction. *See Johnson*, 238 A.3d at 1182 n.9 ("[I]nmates are not assumed to be ignorant of the law particularly as it relates to the satisfaction of monetary obligations imposed at sentencing."); *Buck*, 879 A.2d at 160 ("With respect to the due process claim, it is significant that Section 9728(b)(5) became effective two years prior to imposition of [a]ppellant's sentence. Therefore, at the time of his sentencing he was on notice of [DOC's] statutory authority to deduct funds from his account."). Those cases framed notice of the rate of deduction as requiring notice of DOC's policy because, under both the prior and current versions of Section 9728(b)(5), DOC had discretion to set that rate through its policy. But I disagree with the majority that those cases necessarily require a focus on whether **notice of DOC's policy** was provided to, in effect, give notice of the rate of deduction; instead, the critical inquiry is whether the inmate had **notice of the rate of deduction itself**.

If the statute adequately provides notice of the rate of deduction, it satisfies that item as required by *Montañez*, *Bundy*, and *Johnson*. Here however, as the majority ably explains, that is not the case. The majority is undoubtedly correct the plain text of the 2019 amendment "permits the DOC to exercise at least some discretion, as the legislature did not mandate a 25% deduction rate across the board, it set a **minimum** deduction rate of 25%." Majority Opinion at 53 (emphasis in original). I agree "DOC is clearly afforded discretion under Act 84 to deviate upwards from the 25% minimum rate as the DOC can apply a higher rate on a case-by-case basis[,]" and that logically, DOC's decision to "apply the minimum rate of 25% is itself discretionary, even if the 2019 amendment set an absolute floor." *Id.* Additionally, as the majority explains, DOC may also exercise

---

public laws of the state or country where they reside, and the legal effect of their acts. Persons are likewise presumed to know that laws are subject to change or repeal, and to know of changes made.").

discretion to make downward departures from the 25% rate by making no deductions from inmate accounts with less than $10.  *See id.* at 53.  DOC's own policy therefore "demonstrates that it operates with discretion[.]"  *Id.*[6]  Thus, while I believe a statute setting the rate of deduction **could** satisfy the notice requirement in *Montañez*, *Bundy*, and *Johnson*, I agree with the majority the current version of Section 9728(b)(5) does not provide such notice.

For similar reasons, I agree with the majority the Legislative Act Doctrine does not apply to obviate the need for due process in this case.  Briefly, the Legislative Act Doctrine originated in a pair of United States Supreme Court cases, *Londoner v. City and County of Denver*, 210 U.S. 373 (1908), and *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915).  In *Londoner*, the High Court held Denver's city council violated due process when it acted as a board of equalization to assess a tax against a certain group of taxpayers without first affording them the opportunity for a hearing.  *See Londoner*, 210 U.S. at 384-86.  It explained that while the Constitution imposes few restrictions on the states when it comes to the collection of property taxes, "where the legislature of a state, instead of fixing the tax itself, commits to some subordinate body the duty of determining whether, in what amount, and upon whom it shall be levied, and

---

[6] The dissent's point "question[ing] whether DOC even has the authority to [exclude inmates with a balance less than $10 from deductions] given that Act 84, as amended, does not permit DOC to deviate below the minimum 25% deduction rate" is well taken. Dissenting Opinion at 8 n.5.  But, interpreting Section 9728(b)(5) as not allowing DOC to refrain from deducting from accounts with such a low balance could potentially open the statute up to other legal infirmities.  *See Montañez*, 773 F.3d at 486 ("[W]e find nothing substantively unreasonable about the DOC's refusal to provide exceptions to its across-the-board 20% rate of deduction, in light of the fact that the DOC will not make deductions when an inmate's account falls below a certain minimum.").  Even the dissent acknowledges this issue is not before us.  *See* Dissenting Opinion at 8 n.5.  In any case, for the reasons explained by the majority, Section 9728(b)(5) gives DOC discretion regardless of the validity of the $10 account minimum.  Plus, notwithstanding Section 9728(b)(5), DOC's policy setting a $10 account minimum shows that DOC is in fact exercising discretion to go below the 25% rate.

of making its assessment and apportionment, due process of law requires that, at some stage of the proceedings, before the tax becomes irrevocably fixed, the taxpayer shall have an opportunity to be heard, of which he must have notice, either personal, by publication, or by a law fixing the time and place of the hearing." *Id.* at 385-86.

Later, in *Bi-Metallic*, the Supreme Court considered an order of the Colorado State Board of Equalization and the Colorado Tax Commission that increased the valuation of **all** taxable property in Denver by 40%. *See Bi-Metallic*, 239 U.S. at 443. The plaintiff challenged the order, arguing it was given no opportunity to be heard and that its property would be taken without due process. *See id.* at 444. The Supreme Court held due process did not require individual taxpayers be afforded an opportunity to be heard. *See id.* at 445. It departed from *Londoner*, where the government action was adjudicatory in nature,[7] explaining in the context of governmental acts that are legislative in nature,

> [w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Id.* Importantly, in reaching its determination, the Court noted it "assume[d] that the proper state machinery ha[d] been used" to effectuate the order. *Id.*

Considering this *Londoner/Bi-Metallic* dichotomy, I agree with the majority that amended Act 84 does not call for application of the Legislative Act Doctrine. Again, the plain text of Section 9728(b)(5) itself gives DOC discretion in setting rates of deduction,

---

[7] The *Bi-Metallic* Court distinguished *Londoner* on the facts that there, "a local board had to determine 'whether, in what amount, and upon whom' a tax for paving a street should be levied for special benefits[, and a] relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual grounds[.]" *Bi-Metallic*, 239 U.S. at 446.

at least allowing DOC to deduct at a rate higher than 25%. *See* 42 Pa.C.S. §9728(b)(5). But also, as the majority explains, "[t]he DOC cannot rely on the Legislative Act Doctrine to disregard *Bundy*'s procedural due process mandate based on the 2019 amendment to Act 84 when the DOC does not itself treat that amendment as a general statute that establishes an absolute minimum 25% deduction rate that applies to all inmates subject to Act 84." Majority Opinion at 58. Because Section 9728(b)(5) grants discretion to DOC to adjudicate the rates and amounts to be paid by the inmates, the statute presents a scenario much more akin to *Londoner* than *Bi-Metallic*. *See Londoner*, 210 U.S. at 385 ("where the legislature of a state, instead of fixing the tax itself, commits to some subordinate body the duty of determining whether, in what amount, and upon whom it shall be levied, and of making its assessment and apportionment, due process of law requires that, at some stage of the proceedings, before the tax becomes irrevocably fixed, the taxpayer shall have an opportunity to be heard, of which he must have notice").

Indeed, even the dissenting opinion does not argue Section 9728(b)(5) itself eliminates the need for due process pursuant to the Legislative Act Doctrine. I respectfully disagree, however, with the dissenting opinion's contention that DOC's "promulgation and implementation of its Act 84 policy . . . constitutes a legislative action[,]" and therefore, Washington "is not entitled to any procedural due process in addition to what he already received prior to DOC's initial Act 84 deduction from his inmate account." Dissenting Opinion at 1 (footnote omitted). In short, I classify the Act 84 deductions as adjudicatory in nature, even when viewed in light of DOC's Act 84 policy. Preliminarily, I disagree with the dissent's premises "DOC's Act 84 policy applies equally to all inmates, and DOC has no discretion in its application to those inmates[,]" and that DOC is not "making any determination relative to [an] inmate's individual situation." *Id.* at 7. The $10 account minimum clearly shows DOC's policy calls for individualized determinations about

inmates' individual situations: some inmates subject to Act 84 deductions pay 25% while others pay nothing, based on the amount of money in their accounts.

But perhaps more importantly, I reject the notion a mere statement of DOC's policy regarding Act 84 deductions could be considered "legislative" under Pennsylvania law. Critically, DOC's Act 84 policy did not go through the channels of notice-and-comment rulemaking prescribed in the Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act. Certainly, agencies like DOC may develop their own policies to effectively execute their functions, but the legal force of a particular rule depends upon how that rule was created. In *Northwestern Youth Services, Inc. v. Department of Public Welfare*, 66 A.3d 301 (Pa. 2013), we explained this distinction between what are (fittingly) referred to as "legislative" and "non-legislative" rules.

We began by acknowledging "[c]ommonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly, which is, as a general rule, by way of recourse to procedures prescribed in the Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act." *Nw. Youth Servs.*, 66 A.3d at 310. We elaborated, however, that when an agency acts under those laws and "promulgates published regulations through the formal notice, comment, and review procedures prescribed in those enactments, its resulting pronouncements are accorded the force of law and are thus denominated 'legislative rules.'" *Id.*

By contrast, "**[n]on-legislative rules** — more recently couched (in decisions and in the literature) as 'guidance documents' — comprise a second category of agency pronouncements recognized in administrative law practice. These come in an abundance of formats with a diversity of names, including guidances, manuals, interpretive memoranda, staff instructions, **policy statements**, circulars, bulletins, advisories, press

releases and others." *Id.* (internal quotation marks and citation omitted) (emphasis added). We then specifically described "statements of policy" as "agency pronouncements which are not intended to bind the public and agency personnel, but rather, merely express an agency's tentative, future intentions[.]" *Id.* at 311, *citing Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 712 A.2d 741, 743 n.8 (Pa. 1998) (defining statements of policy as "agency pronouncements that declare its future intentions but which are applied prospectively on a case-by-case basis and **without** binding effect") (emphasis in original); *see also Pa. Hum. Rels. Comm'n v. Norristown Area Sch. Dist.*, 374 A.2d 671, 679 (Pa. 1977) ("A general statement of policy . . . does not establish a 'binding norm'. . . . A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued."), *quoting Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).

Statements of policy are, quite literally, called "non-legislative rules," and furthermore, under the *Londoner/Bi-Metallic* dichotomy, DOC's Act 84 policy is not "legislative" because, as described above, such statements of policy are non-binding. They are mere expressions of how the agency intends to act in the future, typically, by way of a future regulation or an adjudication. Theoretically, if DOC wanted, it could change its deduction policy tomorrow.[8] Here, DOC's Act 84 policy announced its intention

---

[8] I do not suggest DOC's development or revision of its policies is hasty or not well considered. In fact, DOC has a policy outlining its thorough process for development and revision of its policies. *See Policy Management System, Policy No. 1.1.1,* DEP'T OF CORRECTIONS (Feb. 16, 2021), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/01.01.01%20Policy %20Management%20System.pdf. But those processes, however thorough, are simply different from the procedures of notice-and-comment rulemaking (which inherently protect due process as envisioned in *Bi-Metallic*), and so the resulting policy is not binding law. Indeed, DOC Policy 1.1.1 includes a provision explaining when a newly developed or revised policy should go through the regulatory review process, which specifically (continued…)

to impose a 25% deduction rate unless the inmate's account has less than $10 in it. Then, the subsequent imposition of a deduction rate on the inmate constitutes an adjudication for that individual.[9]

Ultimately, because an agency policy that does not go through the normal notice-and-comment rulemaking process does not have the force of law and is not binding, *see Nw. Youth Servs.*, 66 A.3d at 310, it must be effectuated through a subsequent agency action — in this case, an adjudication against Washington. Under *Londoner*, adjudications require due process, and under *Montañez* and *Bundy*, that process must include, *inter alia*, notice of the rate of deduction and an opportunity to be heard before the first deduction. Thus, Washington was entitled to such process.

Nevertheless, I appreciate the point made in dissent that this Court held certain DOC policies were legislative and not subject to procedural due process. *See* Dissenting Opinion at 5-7, *citing Small v. Horn*, 722 A.2d 664 (Pa. 1998) (rejecting challenges to DOC bulletins announcing a new policy restricting civilian attire after six inmates escaped), *and Sutton v. Bickell*, 220 A.3d 1027 (Pa. 2019) (relying on *Small* to reject a procedural due process challenge to a DOC policy banning Timberland and Rocky boots after a prison guard died when an inmate kicked him in the head with boots). But a critical fact distinguishes those decisions from the present case and the other Act 84 cases: the policies in *Small* and *Sutton* were meant to address safety and prison security.

---

provides the Bureau of Standards, Audits, Assessments, and Compliance shall, *inter alia*, "promulgate them consistent with applicable law." *Id.* at 2-11 – 2-12.

[9] The dissent relies on language from *Small v. Horn*, 722 A.2d 664 (Pa. 1998), defining adjudicative actions as "those that affect one individual or a few individuals[,] and apply existing laws or regulations to facts that occurred prior to the adjudication." Dissenting Opinion at 4, *quoting Small*, 722 A.2d at 671 n.12. Even under this definition, DOC's application of Act 84 (the "existing law[] or regulation[]") to the inmates based on the prior month's deposits into their inmate accounts ("facts that occurred prior") would be an adjudication. *Small*, 722 A.2d at 671 n.12.

Importantly, in *Small*, before we addressed the inmates' procedural due process challenge, we rejected a claim the policy restricting civilian clothing was invalid because it did not comply with the rulemaking process in the Commonwealth Documents Law and Regulatory Review Act. In doing so, we held the clothing policy was exempt from the procedures required in those laws because it fell within a recognized "category of agency decisions that are inherently committed to the agency's sound discretion and that cannot reasonably be subjected to the 'normal public participation process.'" *Small*, 722 A.2d at 669, *quoting Indep. State Store Union v. Pa. Liquor Control Bd.*, 432 A.2d 1375,1380 (Pa. 1981) ("These business-type decisions entrusted to the Board are a unique form of governmental activity which are not amenable to the normal public participation process, and not subject to the Documents Law."). We explained why the civilian clothing policy fell within this category:

> Because of the **unique nature and requirements of the prison setting**, imprisonment "carries with it the circumscription or loss of many significant rights . . . to accommodate a myriad of institutional needs . . . chief among which is internal security." *Hudson v. Palmer*, [468 U.S. 517, 524 (1984)]. Accordingly, the Department must enforce reasonable rules of internal prison management **to ensure public safety and prison security**. These rules must be modified as conditions change, different security needs arise, and experience brings to light weaknesses in current security measures. Where, as here, the measure has at most an incidental effect on the general public, it is reasonable to conclude that the Legislature did not intend the measure to be subjected to the "normal public participation process."

*Id.* at 669-70 (footnote omitted) (emphasis added).

But in *Bundy*, we held the provision of process attendant to Act 84 deductions would not disrupt those interests described in *Small*:

> As a general precept, the interests of inmates must always be balanced against the unique institutional concerns that arise in the prison setting *. . .* — such as securing the prison's physical plant, maintaining order, safety, and discipline, and providing for prisoners' rehabilitative needs. *See . . . Small v. Horn*, . . . 722 A.2d 664, 672 (1998). Nevertheless, the provision of notice and a meaningful (if informal) means to challenge the amount of

the debt, assert an exemption, or otherwise raise an objection to the deduction scheme, seems unlikely to impact upon these institutional goals.

*Bundy*, 184 A.3d at 558 (quotation marks and citations omitted).

We have explicitly held Act 84 deductions affect prisoner property interests and are thus subject to procedural due process protections, despite the fact DOC implemented policies concerning the deductions. And because DOC's new policy is still just that — a statement of policy that was never subject to the legislative-like process of notice-and-comment rulemaking — I see no reason why *Bi-Metallic* would strip inmates of their procedural due process rights. In *Bi-Metallic*, the Supreme Court explained "[g]eneral statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." 239 U.S. at 445 (further assuming "the proper state machinery ha[d] been used"). Here, where an unelected administrative agency released a policy without promulgating it through the public notice-and-comment process, *Bi-Metallic*'s conditions are simply unmet. Thus, notwithstanding *Bi-Metallic*, DOC's Act 84 policy did not eliminate Washington's entitlement to procedural due process.[10]

As a final point, I briefly stress the process due here need not be particularly formal or burdensome to DOC. In *Buck*, we held inmates are not entitled to a judicial hearing prior to the first Act 84 deduction. *See* 879 A.2d at 161. In *Montañez*, the Third Circuit suggested "after providing the required initial notice the DOC could provide inmates with

---

[10] The majority makes a salient point that disenfranchised prisoners do not have the political remedy envisioned by *Bi-Metallic*. *See* Majority Opinion at 60-61 n.53. However, absent full litigation of this complex topic, I would avoid a pronouncement today that this bedrock principle of administrative law does not apply to the large populations of Pennsylvanians who cannot vote (which would not only be prisoners, but also, for example, children), and reserve judgment on that issue.

an informal opportunity to supply written objections to prison administrators prior to the first deduction." *Montañez*, 773 F.3d at 486. The court explained "DOC retain[ed] discretion, consistent with its constitutional obligations, to implement such procedures in a flexible and cost-effective manner." *Id.* Then, in *Bundy*, we agreed with the *Montañez* court, and noted even "informal" procedures could satisfy due process. *Bundy*, 184 A.3d at 558-59 (explaining DOC simply must "(a) inform the inmate of the total amount of his financial liability as reflected in his sentencing order, as well as [DOC's] policy concerning the rate at which funds will be deducted from his account and which funds are subject to deduction; and (b) give the inmate a reasonable opportunity to object to the application of the Department's policy to his account"). We held such informal process would not "significantly imped[e] [DOC's] ability to carry out essential functions" for purposes of the *Mathews* balancing test. *Id.* at 559.

Thus, although we use the term "hearing," *see* Majority Opinion at 63 n.55, I clarify (at least in my view) a "hearing" in this context still need not be formal. It must only comply with the requirements of *Bundy*. Indeed, DOC's Act 84 policy already provides for such an informal process, including a form with written notice of all of the *Bundy* items (including the 25% deduction rate) and which informs inmates they have an opportunity to be heard if they file a grievance within 15 working days. *See Collection of Inmate Debts, DC-ADM 005*, DEP'T OF CORRECTIONS, at Attachment 3-A (Jan. 15, 2020), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/005%20Collection% 20of%20Inmate%20Debts.pdf. Although this DOC form is currently used before the first Act 84 deduction in compliance with *Bundy*, I suggest similarly informal means could be used to provide procedural due process regarding the rate increase. But in accordance with the Court's disposition remanding to the Commonwealth Court for further

proceedings, the lower court can determine the specific post-deprivation process Washington should receive on remand.

In sum, although I employ slightly different reasoning, I agree with the majority that Washington was entitled to procedural due process before implementation of the rate increase. I therefore join the majority opinion but for the caveats discussed above.